**ON REHEARING EN BANC**

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 15-1591**

---

NANCY LUND; LIESA MONTAG-SIEGEL; ROBERT VOELKER,

Plaintiffs - Appellees,

v.

ROWAN COUNTY, NORTH CAROLINA,

Defendant - Appellant.

-------------------------------------

STATE OF WEST VIRGINIA; STATE OF ALABAMA; STATE OF ARIZONA; STATE OF ARKANSAS; STATE OF FLORIDA; STATE OF INDIANA; STATE OF MICHIGAN; STATE OF NEBRASKA; STATE OF NEVADA; STATE OF OHIO; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF TEXAS; MEMBERS OF CONGRESS; UNITED STATES JUSTICE FOUNDATION; CONSERVATIVE LEGAL DEFENSE AND EDUCATION FUND; CITIZENS UNITED; CITIZENS UNITED FOUNDATION,

Amici Supporting Appellant,

AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE; AMERICAN HUMANIST ASSOCIATION; ANTI-DEFAMATION LEAGUE; CENTER FOR INQUIRY; FREEDOM FROM RELIGION FOUNDATION; INTERFAITH ALLIANCE FOUNDATION; SIKH COALITION; UNION FOR REFORM JUDAISM; WOMEN OF REFORM JUDAISM,

Amici Supporting Appellees.

---

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. James A. Beaty, Jr., Senior District Judge. (1:13-cv-00207-JAB-JLW)

---

Argued: March 22, 2017                             Decided: July 14, 2017

---

Before GREGORY, Chief Judge, and WILKINSON, NIEMEYER, MOTZ, TRAXLER, KING, SHEDD, DUNCAN, AGEE, KEENAN, WYNN, DIAZ, FLOYD, THACKER, and HARRIS, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Gregory and Judges Motz, King, Duncan, Keenan, Wynn, Floyd, Thacker, and Harris joined. Judge Motz wrote a concurring opinion in which Judges Keenan and Harris joined. Judge Niemeyer wrote a dissenting opinion in which Judge Shedd joined. Judge Agee wrote a dissenting opinion in which Judges Niemeyer, Traxler, Shedd, and Diaz joined.

---

**ARGUED:** Allyson Newton Ho, MORGAN, LEWIS & BOCKIUS LLP, Dallas, Texas, for Appellant. Christopher Anderson Brook, AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA, Raleigh, North Carolina, for Appellees. Elbert Lin, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Amici State of West Virginia and 12 Other States. **ON BRIEF:** David C. Gibbs, III, THE NATIONAL CENTER FOR LIFE AND LIBERTY, Flower Mound, Texas; John C. Sullivan, Dallas, Texas, Judd E. Stone, Michael E. Kenneally, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C.; David A. Cortman, Brett B. Harvey, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona; Hiram S. Sasser, III, Kenneth A. Klukowski, LIBERTY INSTITUTE, Plano, Texas, for Appellant. Daniel Mach, Heather L. Weaver, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, Washington, D.C., for Appellees. Patrick Morrisey, Attorney General, Julie Marie Blake, Christopher W. Carlson, Assistant Attorneys General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Amicus State of West Virginia; Luther Strange, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama, for Amicus State of Alabama; Mark Brnovich, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARIZONA, Phoenix, Arizona, for Amicus State of Arizona; Leslie Rutledge, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARKANSAS, Little Rock, Arkansas, for Amicus State of Arkansas; Pamela Jo Bondi, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF FLORIDA, Tallahassee, Florida, for Amicus State of Florida; Gregory F. Zoeller, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF INDIANA, Indianapolis, Indiana, for Amicus State of Indiana; Bill Schuette, Attorney General,

OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Lansing, Michigan, for Amicus State of Michigan; Douglas J. Peterson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEBRASKA, Lincoln, Nebraska, for Amicus State of Nebraska; Adam Paul Laxalt, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEVADA, Carson City, Nevada, for Amicus State of Nevada; Michael DeWine, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Amicus State of Ohio; E. Scott Pruitt, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OKLAHOMA, Oklahoma City, Oklahoma, for Amicus State of Oklahoma; Alan Wilson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Amicus State of South Carolina; Ken Paxton, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF TEXAS, Austin, Texas, for Amicus State of Texas. Sean Sandoloski, Dallas, Texas, Thomas G. Hungar, Douglas R. Cox, Alex Gesch, Lindsay S. See, Russell Balikian, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Amici Members of Congress. Joseph W. Miller, Ramona, California, for Amicus United States Justice Foundation; Michael Boos, Washington, D.C., for Amici Citizens United and Citizens United Foundation; William J. Olson, Herbert W. Titus, Jeremiah L. Morgan, Robert J. Olson, John S. Miles, WILLIAM J. OLSON, P.C., Vienna, Virginia, for Amici United States Justice Foundation, Citizens United, Citizens United Foundation, and Conservative Legal Defense and Education Fund. Richard B. Katskee, Gregory M. Lipper, AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, Washington, D.C., for Amici Americans United for Separation of Church and State, American Humanist Association, Anti-Defamation League, Center for Inquiry, Freedom From Religion Foundation, Interfaith Alliance Foundation, Sikh Coalition, Union for Reform Judaism, and Women of Reform Judaism.

———————

WILKINSON, Circuit Judge:

This case requires that we decide whether Rowan County's practice of lawmaker-led sectarian prayer runs afoul of the Establishment Clause. For years on end, the elected members of the county's Board of Commissioners composed and delivered pointedly sectarian invocations. They rotated the prayer opportunity amongst themselves; no one else was permitted to offer an invocation. The prayers referenced one and only one faith and veered from time to time into overt proselytization. Before each invocation, attendees were requested to rise and often asked to pray with the commissioners. The prayers served to open meetings of our most basic unit of government and directly preceded the business session of the meeting. The district court, applying the Supreme Court's decision in *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014), held the county's prayer practice unconstitutional. A panel of this court reversed. *See Lund v. Rowan Cty.*, 837 F.3d 407 (4th Cir. 2016). The full court then granted rehearing en banc.

We conclude that the Constitution does not allow what happened in Rowan County. The prayer practice served to identify the government with Christianity and risked conveying to citizens of minority faiths a message of exclusion. And because the commissioners were the exclusive prayer-givers, Rowan County's invocation practice falls well outside the more inclusive, minister-oriented practice of legislative prayer described in *Town of Greece*. Indeed, if elected representatives invite their constituents to participate in prayers invoking a single faith for meeting upon meeting, year after year, it is difficult to imagine constitutional limits to sectarian prayer practice.

4

The great promise of the Establishment Clause is that religion will not operate as an instrument of division in our nation. Consistent with this principle, there is a time-honored tradition of legislative prayer that reflects the respect of each faith for other faiths and the aspiration, common to so many creeds, of finding higher meaning and deeper purpose in these fleeting moments each of us spends upon this earth. Instead of drawing on this tradition, Rowan County elevated one religion above all others and aligned itself with that faith. It need not be so. As the history of legislative invocations demonstrates, the desire of this good county for prayer at the opening of its public sessions can be realized in many ways that further both religious exercise and religious tolerance.

I.

A.

We begin by describing the challenged prayer practice itself. Rowan County, North Carolina is governed by an elected body known as the Rowan County Board of Commissioners. The five-member Board convenes twice a month. The commissioners sit at the front of the room facing their constituents.

Each Board meeting begins in the same way: with a prayer composed and delivered by one of the commissioners. After calling the meeting to order, the chairperson asks everyone in attendance—commissioners and constituents alike—to stand up. All five Board members rise and bow their heads, along with most of the attendees. A commissioner then asks the community to join him in worship, using phrases such as "Let us pray," "Let's pray together," or "Please pray with me." The

5

invocations end with a communal "Amen," and the Pledge of Allegiance follows a moment later. Next, the Board typically approves the previous meeting's minutes, schedules future items of business, and holds a public comment period before continuing on to the day's work.

Board members rotate the prayer opportunity amongst themselves as a matter of long-standing custom. The content of the prayer is "entirely at the discretion of the commissioner." J.A. 284.[1] No one outside the Board is permitted to offer an invocation.

The prayers are invariably and unmistakably Christian in content. Over the five-and-a-half years for which video recordings are available, 97% of the Board's prayers mentioned "Jesus," "Christ," or the "Savior." *See Lund v. Rowan Cty.*, 103 F. Supp. 3d 712, 714 (M.D.N.C. 2015). No religion other than Christianity was represented. Sectarian references often appeared at the conclusion of the prayer. *See, e.g.*, S.A. 14 (prayer of April 21, 2008) ("I ask all these things in the name of Jesus, the King of Kings and the Lord of Lords. Amen."). Several prayers confessed sin and asked for forgiveness on the community's behalf. *See, e.g.*, S.A. 30 (prayer of August 1, 2011) ("Lord, we confess that we have not loved you with all our heart, and mind and strength, and that we have not loved one another as Christ loves us. We have also neglected to follow the guidance of your Holy Spirit, and have allowed sin to enter into our lives."). Other prayers implied that Christianity was superior to other faiths. *See, e.g.*, S.A. 33 (prayer of March 5, 2012) ("[A]s we pick up the Cross, we will proclaim His name above all names, as the only way

---

[1] "J.A." refers to the Joint Appendix; "S.A." refers to the Supplemental Appendix.

6

to eternal life."). On occasion, Board members appeared to implore attendees to accept Christianity. *See, e.g.*, S.A. 21 (prayer of October 5, 2009) ("Father, I pray that all may be one as you, Father, are in Jesus, and He in you. I pray that they may be one in you, that the world may believe that you sent Jesus to save us from our sins.").

In response to the growing controversy over the prayer practice, a number of commissioners publicly announced that they would continue delivering Christian invocations for the community's benefit. Prior to the filing of this lawsuit, the American Civil Liberties Union of North Carolina Legal Foundation notified the Board that sectarian prayers violated the Establishment Clause under then-applicable Fourth Circuit precedent. The Board did not respond, but several members stated that they would not stop praying in Jesus' name. "[A]sking for guidance for my decisions from Jesus," one commissioner explained, "is the best I, and Rowan County, can ever hope for." *Lund*, 103 F. Supp. 3d at 715 (quoting Commissioner Ford). Another commissioner remarked, "I volunteer to be the first to go to jail for this cause . . . ." *Id.* (quoting Commissioner Sides). After the district court enjoined the county prayer practice, a third commissioner issued a statement noting, "I will always pray in the name of Jesus. . . . God will lead me through this persecution and I will be His instrument." *See* Pls.' Mem. Law Supp. Mot. Summ. J. at 9 (quoting Commissioner Barber).

B.

The three plaintiffs in this case are long-time residents of Rowan County. Active in the community, each one has attended multiple Board meetings to follow issues of public importance. Nancy Lund, a volunteer tutor, cares about school funding. So does

7

Liesa Montag-Siegel, a retired middle school librarian. Robert Voelker is interested in education policy and the county's provision of social services. The plaintiffs, none of whom identify as Christian, encountered prayers of the sort described above at Board meetings.

In March 2013, Lund and her co-plaintiffs filed this action against Rowan County, asserting that the Board's prayer practice violated the Establishment Clause. They argued that the Board, by delivering exclusively Christian prayers, affiliated the county with Christianity, advanced Christianity, and coerced the plaintiffs into participating in religious exercises. According to the plaintiffs, the prayers "sen[t] a message that the County and the Board favor Christians" and caused the plaintiffs to feel "excluded from the community and the local political process." J.A. 11-12. The plaintiffs also averred that they felt compelled to stand for the invocations to avoid sticking out. Voelker added that he felt pressured to stand because "the invocation is immediately followed by the Pledge of Allegiance, for which [he] feels strongly that he needs to stand." J.A. 12. At one meeting, Voelker proposed a nondenominational prayer and later worried that his "open questioning" of the Board's sectarian invocations would impair his advocacy on other matters. J.A. 13. The plaintiffs sought declaratory and injunctive relief as well as a preliminary injunction against sectarian prayers at Board meetings.

Rowan County responded with affidavits from each Board member adding new details on the prayer practice. According to these affidavits, the Board has no written policy on the invocations. The commissioners also claimed that the Board has "no expectation . . . regarding the form or content" of the prayers, J.A. 291, which are offered

8

"for the edification and benefit of the commissioners and to solemnize the meeting," J.A. 293. Finally, the affidavits clarified that attendees may leave the room or arrive after the invocation and that the Board "respects the right of any citizen" to remain seated or disregard the invocation. J.A. 277.

After the district court preliminarily enjoined the Board from delivering sectarian prayers, the Supreme Court decided *Town of Greece v. Galloway*. The Court upheld the town's practice of opening its legislative sessions with sectarian prayers and ruled that sectarian prayers, while subject to some limits, are constitutional as a general matter.

In light of *Town of Greece*, both the plaintiffs and Rowan County moved for summary judgment. The district court held that Rowan County's prayer practice remained unconstitutional and issued a permanent injunction. *Lund*, 103 F. Supp. 3d at 733-34. The court found that the practice was unconstitutionally coercive and "deviate[d] from the long-standing history and tradition" of legislative prayer. *Id.* at 723. That tradition, as articulated by the Supreme Court, involved the delivery of prayers by "a chaplain, separate from the legislative body." *Id.* Here, the court reasoned, the prayers were "exclusively prepared and controlled" and delivered by the government, "constituting a much greater and more intimate government involvement in the prayer practice than that at issue in *Town of Greece*." *Id.* Further, restricting the prayer opportunity to the Board resulted in "a closed-universe of prayer-givers . . . who favored religious beliefs believed to be common to the majority of voters in Rowan County." *Id.* The district court noted that although lawmaker-led prayer "is not *per se*

9

unconstitutional," the prayer-giver's identity is relevant to the constitutional inquiry "in relation to the surrounding circumstances." *Id.* at 722 n.4.

On appeal, this court reversed the district court's judgment and upheld the county's prayer practice. *Lund*, 837 F.3d at 411-31. The panel majority recognized that "[t]he five commissioners, all Christian, 'maintain[ed] exclusive and complete control over the content of the prayers.'" *Id.* at 434 (quoting *Lund*, 103 F. Supp. 3d at 733). Nonetheless, the majority held that the identity of the prayer-giver was not "a significant constitutional distinction, at least in the context of this case." *Id.* at 420. Having discounted the source of the prayer as a relevant consideration, the majority next examined the other elements of the Board's practice seriatim. The majority held that the practice was consistent with tradition as outlined in *Town of Greece* and was not coercive. *Id.* at 430.

Judge Wilkinson dissented. The dissent argued that the "combination of legislators as the sole prayer-givers, official invitation for audience participation, consistently sectarian prayers referencing but a single faith, and the intimacy of a local governmental setting exceed[ed] even a broad reading of *Town of Greece*." *Id.* at 431 (Wilkinson, J., dissenting) (hereinafter panel dissent). After examining "the interaction among elements specific to this case," *id.* at 433, the dissent concluded that the county's prayer practice was unconstitutional.

We granted rehearing en banc, and we now affirm. Reviewing the district court's decision de novo, *see Simpson v. Chesterfield Cty. Bd. of Supervisors*, 404 F.3d 276, 280

10

(4th Cir. 2005), we hold that Rowan County's prayer practice violated the Establishment Clause of the First Amendment.

## II.

"[A] moment of prayer or quiet reflection sets the mind[s] [of legislators] to a higher purpose and thereby eases the task of governing." *Town of Greece*, 134 S. Ct. at 1825 (plurality opinion). Legislative prayer "lends gravity to public business, reminds lawmakers to transcend petty differences in pursuit of a higher purpose, and expresses a common aspiration to a just and peaceful society." *Id.* at 1818 (majority opinion). Owing to its unique history and longstanding role in public life, legislative prayer occupies "a field of Establishment Clause jurisprudence with its own set of boundaries and guidelines." *Simpson*, 404 F.3d at 281.[2]

But the general principles animating the Establishment Clause remain relevant even in the context of legislative prayer. First, the Constitution "affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984). Second, the government "may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'" *Lee v. Weisman*, 505 U.S. 577, 587 (1992) (quoting *Lynch*, 465 U.S. at 678). By "ensuring governmental neutrality in matters of religion," *Gillette v. United States*, 401 U.S. 437,

---

[2] The term "legislative prayer" refers to offering an invocation to open government meetings, while "lawmaker-led prayer" or "legislator-led prayer" denotes a subset of invocations delivered by members of the legislative body.

11

449 (1971), the Establishment Clause safeguards religious liberty and wards off "political division along religious lines," *Lemon v. Kurtzman*, 403 U.S. 602, 622 (1971). An instrument of social peace, the Establishment Clause does not become less so when social rancor runs exceptionally high.

In addition, "[b]y pairing the Free Exercise Clause with the Establishment Clause," the Framers sought to prevent government from choosing sides on matters of faith and to protect religious minorities from exclusion or punishment at the hands of the state. *Lund*, 837 F.3d at 438 (panel dissent). "Americans are encouraged to practice and celebrate their faith but not to establish it through the state." *Id.*

In the legislative prayer context, the Supreme Court has given meaning to the abstract guarantees of the Establishment Clause by considering "historical practices and understandings." *Town of Greece*, 134 S. Ct. at 1819 (internal quotation marks omitted). This history "shed[s] light on how the Founders viewed the Establishment Clause in relation to legislative prayer." *Lund*, 837 F.3d at 414. The resulting principles, first elucidated in *Marsh v. Chambers*, 463 U.S. 783 (1983), and refined in *Town of Greece*, reflect "what history reveals was the contemporaneous understanding" of the Establishment Clause. *Lynch*, 465 U.S. at 673.

*Marsh* and *Town of Greece*, however, in no way sought to dictate the outcome of every subsequent case. The Court acknowledged that it has not "define[d] the precise boundary of the Establishment Clause." *Town of Greece*, 134 S. Ct. at 1819. Accordingly, when the historical principles articulated by the Supreme Court do not

12

direct a particular result, a court must conduct a "fact-sensitive" review of the prayer practice. *Id.* at 1825 (plurality opinion).

*Marsh* and *Town of Greece* do not settle whether Rowan County's prayer practice is constitutional. Those decisions did not concern lawmaker-led prayer, nor did they involve the other unusual aspects of the county's prayer practice. And they certainly did not address the confluence of these elements. That said, *Marsh* and *Town of Greece* provide our doctrinal starting point. We shall begin by describing the principles they developed and then proceed to apply those principles to this case.

A.

In *Marsh v. Chambers*, the Supreme Court upheld the Nebraska legislature's practice of opening its sessions with nonsectarian prayers delivered by a paid chaplain. 463 U.S. at 793 n. 14. The Court noted that legislative prayer "has coexisted with the principles of disestablishment and religious freedom" since the colonial period. *Id.* at 786. In addition, the First Congress "authorized the appointment of paid chaplains" shortly after finalizing language for the First Amendment. *Id.* at 788. Accordingly, the Court reasoned, the Framers could not have viewed "paid legislative chaplains and opening prayers as a violation of that Amendment." *Id.*

*Marsh*, then, stands for the principle that "legislative prayer, while religious in nature, has long been understood as compatible with the Establishment Clause." *Town of Greece*, 134 S. Ct. at 1818. But even as the Court concluded that legislative prayer is constitutional as a general matter, *Marsh* recognized certain limits on the practice.

13

Namely, the prayer opportunity may not be "exploited to proselytize or advance [a particular faith] or to disparage any other." *Marsh*, 463 U.S. at 794-95.

Thirty years later, in *Town of Greece v. Galloway*, the Court held that sectarian prayer is not by itself unconstitutional. 134 S. Ct. at 1820. In that case, the town board in Greece, New York began its monthly meetings with sectarian invocations given by volunteer guest ministers. *Id.* at 1816. Because "nearly all of the congregations in town turned out to be Christian," most of the ministers were Christian too. *Id.* at 1824. Nonetheless, the town also invited a Jewish layman and Baha'i practitioner to deliver prayers and granted a Wiccan priestess's request to do so. *Id.* at 1817. The town "neither reviewed the prayers in advance of the meetings nor provided guidance as to their tone or content." *Id.* at 1816.

Invoking the historical tradition first described in *Marsh*, the Court held that the Establishment Clause does not require "nonsectarian or ecumenical prayer as a single, fixed standard." *Id.* at 1820. As a result, "a challenge based *solely* on the content of a prayer will not likely establish a constitutional violation." *Id.* at 1824 (emphasis added).

At the same time, the Court was quick to clarify that invocation content is still germane to the constitutionality of a prayer practice. The "relevant constraint" on faith-specific prayer "derives from its place at the opening of legislative sessions, where it is meant to lend gravity to the occasion and reflect values long part of the Nation's heritage." *Id.* at 1823. Prayer that "invites lawmakers to reflect upon shared ideals and common ends before they embark on the fractious business of governing" serves that purpose. *Id.* But the Establishment Clause does not countenance prayers that "denigrate

14

nonbelievers or religious minorities, threaten damnation, or preach conversion" or, per *Marsh*, prayers that proselytize or advance or disparage a particular faith. *Id.*

Applying these principles, the Court concluded that the sectarian prayers offered by guest ministers fell within the historical tradition outlined in *Marsh*. *Id.* at 1824. The Court also emphasized that Greece selected chaplains without discriminating among faiths and "welcome[d] a prayer by any minister or layman who wished to give one." *Id.*

Finally, the Court concluded that the town's prayer practice did not coerce participation by meeting attendees. *Id.* at 1828. While no single test commanded a majority, Justice Kennedy's opinion for the plurality explained that "[t]he analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity." *Id.* at 1826.

B.

*Marsh* and *Town of Greece* thus show a Court generally supportive of legislative prayer, careful to emphasize that sectarian references are permissible in proper context, but cautioning that the prayer opportunity not get out of hand. This case differs from *Marsh* and *Town of Greece* in two crucial respects that, in combination with other aspects of the Board's prayers, give rise to an unprecedented prayer practice. First, whereas guest ministers delivered the prayers in those cases, the legislators themselves gave the invocations in Rowan County. Second, the prayer opportunity here was exclusively reserved for the commissioners, creating a "closed-universe" of prayer-givers. *Lund*, 103

15

F. Supp. 3d at 723. This case is therefore "more than a factual wrinkle on *Town of Greece*." *Lund*, 837 F.3d at 431 (panel dissent). "It is a conceptual world apart." *Id.*

To begin, *Town of Greece* simply does not address the constitutionality of lawmaker-led prayer. The Court has "consistently discussed legislative prayer practices in terms of invited ministers, clergy, or volunteers providing the prayer." *Lund*, 103 F. Supp. 3d at 722. And in elaborating on our national tradition of legislative prayer—the history informing its interpretation of the Establishment Clause—the Court has "not once described a situation in which the legislators themselves gave the invocation." *Id. Town of Greece* instead recounts how "[t]he First Congress made it an early item of business to appoint and pay official *chaplains*," adding that "both the House and Senate have maintained the office virtually uninterrupted since that time." 134 S. Ct. at 1818 (emphasis added).

To the extent that *Town of Greece* touches on the constitutional relevance of the prayer-giver's identity, the decision takes for granted the use of outside clergy. The Court emphasized that the town "neither edit[ed] [n]or approv[ed] prayers" offered by the guest ministers. *Id.* at 1822. Addressing the fact that attendees were asked to stand, the plurality reasoned that "[t]hese requests . . . came not from town leaders but from the guest ministers, who presumably are accustomed to directing their congregations in this way." *Id.* at 1826. And "[t]he inclusion of a brief, ceremonial prayer as part of a larger exercise in civic recognition," the plurality explained, "suggests that its purpose and effect are to acknowledge religious leaders and the institutions they represent." *Id.* at 1827.

Thus the historical "practice of prayer," at least as described by the Supreme Court, is not entirely "similar to that now challenged." *Marsh*, 463 U.S. at 791. In Rowan County, the commissioners themselves, not guest ministers, led the community in prayer, and they composed each invocation "according to their personal faiths." *Lund*, 103 F. Supp. 3d at 724; *see* J.A. 275-94 (affidavits of the commissioners). Relative to *Town of Greece*, the county's prayer practice featured "much greater and more intimate government involvement." *Lund*, 103 F. Supp. 3d at 723. The conspicuous absence of case law on lawmaker-led prayer is likely no accident. As elaborated below, this type of prayer both identifies the government with religion more strongly than ordinary invocations and heightens the constitutional risks posed by requests to participate and by sectarian prayers.

This is especially true where legislators are the *only* eligible prayer-givers. Both *Town of Greece* and *Marsh* involved open, inclusive prayer opportunities. In the former case, the town "at no point excluded or denied an opportunity to a would-be prayer giver," and town leaders affirmed that "a minister or layperson of any persuasion, including an atheist, could give the invocation." *Town of Greece*, 134 S. Ct. at 1816. *Marsh* emphasized that the ordinary chaplain "was not the only clergyman heard by the Legislature; guest chaplains . . . officiated at the request of various legislators and as substitutes during [the regular chaplain's] absences." *Marsh*, 463 U.S. at 793. The openness evinced by these other elected bodies contrasts starkly with Rowan County's policy of restricting the prayer opportunity to the commissioners alone.

17

*Marsh* and *Town of Greece*, while supportive of legislative prayer, were measured and balanced decisions. *See* 134 S. Ct. at 1824-25 (describing the proper inquiry as "fact-sensitive" and the analysis as "an inquiry into the prayer opportunity as a whole"). The dissents in this case, by contrast, are wholly bereft of any sense of balance. Any balanced assessment of *Marsh* and *Town of Greece* makes clear the dissents' lack of fidelity to those decisions. The dissents' reading of *Town of Greece* is faithful only to what the dissents wish that opinion would say, not to what it actually said. As *Town of Greece* makes plain, the Court has never approved anything like what has transpired here or anything resembling the dissents' invitation to local government to work sectarian practices into public meetings in whatever manner it wishes. *Id.* at 1826. Rather *Town of Greece* told the inferior federal courts to do exactly what the majority has done here— that is to grant local governments leeway in designing a prayer practice that brings the values of religious solemnity and higher meaning to public meetings, but at the same time to recognize that there remain situations that in their totality exceed what *Town of Greece* identified as permissible bounds. It is the dissents' unwillingness to identify any meaningful limit to any sort of sectarian prayer practice in local governmental functions that draws their fidelity to *Town of Greece* into serious question.

C.

The county, bolstered by amici, argues that there is "a long tradition of opening legislative sessions—at all levels of government—with prayer by legislators themselves." Supp. Br. of Appellant at 3. Members of Congress have occasionally delivered invocations in the Senate and House of Representatives. *See* Br. of Amici Curiae

18

Members of Congress at 6. The state amici, drawing on a national survey, assert that a majority of state legislatures allow lawmakers to offer invocations "on at least some occasions," including seven of the ten state legislative chambers in the Fourth Circuit. Br. of Amici Curiae State of West Virginia and 12 Other States at 13-14. Many county and city governments also permit elected officials to deliver invocations. *Id.* at 15. Setting aside the question of whether contemporaneous practices provide compelling evidence of historical tradition, it is clear that lawmaker-led prayer is far from rare.

The evidence collected by Rowan County and amici, however, only reinforces our conclusion that the county's prayer practice falls outside the tradition of legislative prayer elaborated in *Marsh* and *Town of Greece*. First, while lawmakers may occasionally lead an invocation, this phenomenon appears to be the exception to the rule, at least at the state and federal levels. Amici members of Congress note that "Senators have, from time to time, delivered the prayer," but that "[m]embers routinely invite guest ministers" to offer the invocation. Br. of Amici Curiae Members of Congress at 6-7 (citations omitted). The survey cited by the state amici clarifies that "it is a tradition for a chaplain to be selected to serve the [legislative] body." National Conference of State Legislatures, *Inside the Legislative Process* 5-147 (2002) (hereinafter NCSL Survey). Twenty-seven state legislative chambers designate an official chaplain. *Id.* Seventy-nine invite "visiting chaplains [who] usually rotate among religions." *Id.* Second, Rowan County and amici elide the distinction between extending the prayer opportunity to lawmakers (as many legislatures do) and restricting it to those lawmakers (as Rowan County did here). For the

19

reasons we discuss below, the latter approach poses greater risks under the Establishment Clause.

In marshaling the historical and contemporaneous evidence of lawmaker-led prayer, Rowan County and its amici are waging war against a phantom. The plaintiffs have never contended that the Establishment Clause prohibits legislators from giving invocations, nor did the district court so conclude. *See Lund*, 103 F. Supp. 3d at 722 n.4 ("[T]he Commissioners' provision of prayers is not *per se* unconstitutional. . . . Under a different, inclusive prayer practice, Commissioners might be able to provide prayers . . . ."). Like the plaintiffs and the district court, we "would not for a moment cast all legislator-led prayer as constitutionally suspect." *Lund*, 837 F.3d at 433 (panel dissent). Religious faith is "a source of personal guidance, strength, and comfort." *Id.* at 431. And legislative prayer's "solemnizing effect for lawmakers is likely heightened when they personally utter the prayer." *Id.* at 433. Accordingly, the Establishment Clause indeed allows lawmakers to deliver invocations in appropriate circumstances. Legislator-led prayer is not inherently unconstitutional.

We simply conclude, as the district court did, that the identity of the prayer-giver is relevant to the constitutional inquiry. Establishment Clause questions are by their nature "matter[s] of degree," presupposing some acceptable practices and others that cross the line. *Van Orden v. Perry*, 545 U.S. 677, 704 (2005) (Breyer, J., concurring in the judgment); *see also Lynch*, 465 U.S. at 678-79 ("In each case, the inquiry calls for line drawing; no fixed, *per se* rule can be framed. . . . The line between permissible relationships and those barred by the [Establishment] Clause can no more be straight and

20

unwavering than due process can be defined in a single stroke or phrase or test."). Prayers led by lawmakers, like sectarian prayers, may violate the Establishment Clause in some circumstances. And just as sectarian prayer has its limits, so, too, does legislator-led prayer.

Within the universe of prayers delivered by legislators, the constitutionality of a particular government's approach ultimately will depend on other aspects of the prayer practice. In fact, the very survey proffered by state amici illustrates the importance of viewing lawmaker-led prayer in context. The survey recommends that the prayer-giver "be especially sensitive to expressions that may be unsuitable to members of some faiths" when "opening and closing the prayer." NCSL Survey at 5-146. Because legislator-led invocations vary so widely, "[w]e cannot discern from the general survey proffered by amici which prayers were primarily for the benefit of legislators or commissioners as in *Town of Greece* and which focused, as the prayers did here, on requesting the citizens at the meeting to pray." *Lund*, 837 F.3d at 433 (panel dissent). "Nor do we know from the survey what percentage of prayers given by elected officials generally contain sectarian references or proselytizing exhortations, or which are non-denominational or delivered by legislators of diverse faiths." *Id.*

In sum, the elected members of Rowan County's Board of Commissioners composed and delivered their own sectarian prayers featuring but a single faith. They prevented anyone else from offering invocations. The Board's prayer practice thus pushes this case well outside the confines of *Town of Greece* and indeed outside the realm of lawmaker-led prayer itself. To see just how far outside those boundaries the prayer

21

practice was, we must turn to the operation of the practice itself. Because *Town of Greece* does not resolve this challenge, we must decide whether the county's prayer practice, taken as a whole, exceeded constitutional limits on legislative prayer.

III.

"[W]hen a seat of government begins to resemble a house of worship, the values of religious observance are put at risk, and the danger of religious division rises accordingly." *Lund*, 837 F.3d at 431 (panel dissent). That is why "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). Rowan County's prayer practice violated this maxim by so clearly identifying the government with a particular faith.

Courts adjudicating a challenge to legislative prayer inquire "into the prayer opportunity as a whole, rather than into the contents of a single prayer." *Town of Greece*, 134 S. Ct. at 1824. They must conduct a "fact-sensitive" review of "the setting in which the prayer arises and the audience to whom it is directed," *id.* at 1825 (plurality opinion), as well as "the pattern of prayers over time," *id.* at 1827.

As the exclusive prayer-givers, Rowan County's elected representatives—the very embodiment of the state—delivered sectarian invocations referencing one and only one religion. They asked their constituents to join them in worship. They did so at every meeting of a local governing body for many years. We examine each of these features in turn: commissioners as the sole prayer-givers; invocations that drew exclusively on

22

Christianity and sometimes served to advance that faith; invitations to attendees to participate; and the local government setting.

To respect the Supreme Court's insistence on a fact-sensitive inquiry, we must also pay close attention to the interplay between the various facets of the county's prayer practice. As previously noted, the invocations here were written and given by elected representatives acting in their official capacity. This fact interacts with the other aspects of the county's practice, altering their constitutional significance. Accordingly, we must evaluate these other elements through the lens of the prayer-giver's identity. We conclude that it is the combination of these elements—not any particular feature alone—that "threatens to blur the line between church and state to a degree unimaginable in *Town of Greece*." *Lund*, 837 F. 3d at 435 (panel dissent).

## A.

"It is a cornerstone principle of our Establishment Clause jurisprudence that 'it is no part of the business of government to compose official prayers . . . .'" *Lee*, 505 U.S. at 588 (quoting *Engel v. Vitale*, 370 U.S. 421, 425 (1962)). The government "is without power to prescribe . . . any particular form of prayer which is to be used as an official prayer in carrying on any program of governmentally sponsored religious activity." *Engel*, 370 U.S. at 430. The Court reiterated this foundational point in *Town of Greece*: "Our Government is prohibited from prescribing prayers to be recited in our public institutions in order to promote a preferred system of belief or code of moral behavior." 134 S. Ct. at 1822.

23

But that is precisely what happened in Rowan County, where the five commissioners "maintain[ed] exclusive and complete control over the content of the prayers." *Lund*, 103 F. Supp. 3d at 733. In *Marsh*, the prayer-giver was paid by the state. In *Town of Greece*, the prayer-giver was invited by the state. But in Rowan County, the prayer-giver was the state itself. The Board was thus "elbow-deep in the activities banned by the Establishment Clause—selecting and prescribing sectarian prayers." *Lund*, 837 F.3d at 434 (panel dissent).

By arrogating the prayer opportunity to itself, the Board also restricted the number of faiths that could be referenced at its meetings. When guests are allowed to deliver invocations, as in *Marsh* and *Town of Greece*, legislators can easily expand the religions represented (perhaps in response to requests or on their own initiative). In upholding sectarian prayer, *Town of Greece* emphasized that legislatures are typically able and willing to accommodate diverse faiths. The way to acknowledge "our growing diversity," the Court suggested, is "not by proscribing sectarian content but by welcoming ministers of many creeds." *Town of Greece*, 134 S. Ct. at 1820-21 (citing congressional prayers referencing Buddhism, Hinduism, Islam, and Judaism).

Compare the county's rigid, restrictive practice with the more flexible, inclusive approach upheld in *Town of Greece.* Greece welcomed adherents of all faiths, allowing "any member of the public [the chance] to offer an invocation reflecting his or her own convictions." *Id.* at 1826 (plurality opinion). Most of the guest ministers were Christian, owing to the fact that "nearly all of the congregations in town turned out to be Christian." *Id.* at 1824 (majority opinion). To address complaints, however, the town "invited a

Jewish layman and the chairman of the local Baha'i temple to deliver prayers" and granted a Wiccan priestess's request to participate. *Id.* at 1817. By opening its prayer opportunity to all comers, the town cultivated an atmosphere of greater tolerance and inclusion.

Rowan County regrettably sent the opposite message. Instead of embracing religious pluralism and the possibility of a correspondingly diverse invocation practice, Rowan County's commissioners created a "closed-universe" of prayer-givers dependent solely on election outcomes. *Lund*, 103 F. Supp. 3d at 723. The commissioners effectively insulated themselves from requests to diversify prayer content. And we cannot overlook the fact that the decision to restrict the prayer opportunity to the commissioners was not made by the citizens of Rowan County or some disinterested group but perpetuated by the commissioners themselves—all of whom identify as Protestant Christian. *See* J.A. 275 (United Methodist); J.A. 287 (same); J.A. 279 (Independent Baptist); J.A. 291 (same); J.A. 283 (Southern Baptist).

For any Buddhists, Hindus, Jews, Muslims, Sikhs, or others who sought some modest place for their own faith or at least some less insistent invocation of the majority faith, the only recourse available was to elect a commissioner with similar religious views. *See* Br. of Appellant at 26. We find this point troubling. "[V]oters may wonder what kind of prayer a candidate of a minority religious persuasion would select if elected. Failure to pray in the name of the prevailing faith risks becoming a campaign issue or a tacit political debit, which in turn deters those of minority faiths from seeking office." *Lund*, 837 F.3d at 435 (panel dissent). Further, allowing the county to restrict to one the

25

number of faiths represented at Board meetings would warp our inclusive tradition of legislative prayer into a zero-sum game of competing religious factions. Our Constitution safeguards religious pluralism; it does not sanction activity which would take us "one step closer to a de facto religious litmus test for public office." *Id.*

Finally, we note that the risk of political division stemming from prayer practice conflict is no mere abstract matter. At one meeting, an individual who "expressed opposition to the Board's prayer practice" was booed and jeered by the audience. *Lund*, 103 F. Supp. 3d at 729. In addition, the prayer practice became a campaign issue in the 2016 Board elections. The two incumbent commissioners favored continuing the county's defense of the prayer practice, while two challengers opposed it. *See* Supp. Br. of Appellees at 16 n.6. The incumbents ultimately prevailed. *Id.* Almost four decades ago, the Supreme Court cautioned that "political division along religious lines . . . is a threat to the normal political process," and is therefore "one of the principal evils against which the First Amendment was intended to protect." *Lemon*, 403 U.S. at 622. Time has done nothing to diminish the salience of this warning.

## B.

Having structured the prayer opportunity so that Board members alone could give voice to their religious convictions, the commissioners unceasingly and exclusively invoked Christianity. Even more problematic, the prayer practice at times "promote[d]" Christianity, the commissioners' "preferred system of belief." *Town of Greece*, 134 S. Ct. at 1822.

26

Rowan County makes the entirely fair point that courts must not become censors of public prayer. The Supreme Court echoed this concern, warning courts away from becoming "supervisors and censors of religious speech." *Id.* A single prayer will thus not "despoil a practice that on the whole reflects and embraces our tradition" of legislative prayer. *Id.* at 1824. At the same time, however, courts must decide the case before them, which cannot be done without "review[ing] the pattern of prayers over time." *Id.* at 1826-27 (plurality opinion). Where even the most cursory look reveals a constitutionally problematic prayer practice, courts have no choice but to examine the entire record, which of course includes the invocations. A proper sensitivity toward the dangers of judicial overreach in this area cannot divest us of a duty which if not performed would grant free rein to governmental sectarian abuse.

The lead dissent decries this inquiry as "judicial review run amok."[3] *Infra* Lead Dissent at 98. But while judicial review of prayer practices might indeed pose a danger in some instances, there is no danger here. Every single individual in Rowan County remains free to pray as he or she sees fit and in the individual or collective setting that he or she finds most meaningful. What government is not free to do, however, is link itself persistently and relentlessly to a single faith. *See Larson*, 456 U.S. at 244 ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."). This evident an identification of the state with one and only one faith is not, we repeat, some marginal or peripheral constitutional violation

---

[3] The lead dissent refers to Judge Agee's dissent.

that we can just shrug off and wish away. For to do so here would wish away the Establishment Clause itself. The overwhelming majority of the Board's invocations referenced tenets of Christianity. Over a period of more than five years, only 4 of 143 prayers were non-sectarian. *Lund*, 103 F. Supp. 3d at 714. The remaining 139 prayers, or 97%, "use[d] ideas or images identified with [Christianity]," *Lee*, 505 U.S. at 588, such as "Jesus," "Christ," or the "Savior," *Lund*, 103 F. Supp. 3d at 714. No other religion was ever represented in the invocations. *Id.* Sectarian references were especially common at the conclusion of the prayer. To list but a few representative examples: "I ask this in the name of the King of Kings, the Lord of Lords, Jesus Christ," S.A. 33 (prayer of March 5, 2012); "[I] ask these things in the name of Jesus and for the sake of His Kingdom," S.A. 15 (prayer of June 2, 2008); "For the sake of your Son, our Savior, the Lord Jesus Christ," S.A. 31 (prayer of October 3, 2011); and "In Jesus' name we pray," S.A. 22 (prayer of November 16, 2009). Several invocations delved into the finer points of Christian theology. One prayer during the holiday season began, "[W]e'd like to thank you for the Virgin Birth, we'd like to thank you for the Cross at Calvary, and we'd like to thank you for the resurrection." S.A. 12 (prayer of December 3, 2007). Another remarked, "Father God, . . . [w]e thank you so much for sending your Son Jesus Christ to this world, and we always remember that this time of year, Lord, and we should remember it always." S.A. 27 (prayer of December 6, 2010).

*Town of Greece* instructs courts to consider a prayer practice from the perspective of the "reasonable observer," who is presumed to be "acquainted with [the] tradition" of legislative prayer. 134 S. Ct. at 1825 (plurality opinion). Although "adult citizens, firm in

28

their own beliefs, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith," *id.* at 1823 (majority opinion), the "reasonable observer"—or even the exceptionally well-informed citizen steeped in the Court's legislative prayer jurisprudence—would be surprised to find exclusively sectarian invocations being delivered exclusively by the commissioners because, as noted, the Court has consistently spoken in terms of guest ministers and outside volunteers.

In addition, as noted, no religion other than Christianity was ever represented at Board meetings. "When the state's representatives so emphatically evoke a single religion in nearly every prayer over a period of many years, that faith comes to be perceived as the one true faith, not merely of individual prayer-givers, but of government itself." *Lund*, 837 F.3d at 434 (panel dissent). Faced with this unchanging tableau, attendees must have come to the inescapable conclusion that the Board "favors one faith and one faith only." *Id.* at 435. This was the inference drawn by the plaintiffs, who described their sense of separation from their own government and the political process itself. *See* S.A. 1-10 (affidavits of the plaintiffs).

It is not necessary, of course, for governments to go out of their way "to achieve religious balancing" in prayer content or to represent some minimum number of faiths. *Town of Greece*, 134 S. Ct. at 1824. But in considering whether government has aligned itself with a particular religion, a tapestry of many faiths lessens that risk whereas invoking only one exacerbates it. Here, the Board's practice created the perception that Rowan County had taken sides on questions of faith.

29

Not only did the Board's invocations convey its singular approval of Christianity, the prayer opportunity on occasion served to advance that faith. The tradition of legislative prayer elaborated in *Town of Greece* was composed of prayers that "reflect upon shared ideals and common ends" and that "strive for the idea that people of many faiths may be united in a community of tolerance and devotion," using sectarian "religious themes [as] particular means to [these] universal ends." *Id.* at 1823. In contrast, the Establishment Clause does not condone a prayer practice that "over time is . . . 'exploited to proselytize or advance any one, or to disparage any other, faith or belief.'" *Id.* (quoting *Marsh*, 463 U.S. at 794-95).

On multiple occasions, the invocations crossed the line from "reflect[ing] upon shared ideals and common ends," *id.* at 1823, to "promot[ing] a preferred system of belief," *id.* at 1822. To begin, several prayers purported to confess spiritual shortcomings on the community's behalf. Consider the following examples:

- "Although you sent Jesus to be Savior of the world, we confess that we treat Him as our own personal God. Although you are one, and the body of Christ is one, we fail to display that unity in our worship, our mission, and our fellowship." S.A. 31 (prayer of October 3, 2011).

- "Lord, we confess that we have not loved you with all our heart, and mind and strength, and that we have not loved one another as Christ loves us. We have also neglected to follow the guidance of your Holy Spirit, and have allowed sin to enter into our lives." S.A. 30 (prayer of August 1, 2011).

- "God of healing mercies, we come to you this day confessing that we are an imperfect people. . . . We acknowledge that we've been given the pathway to peace, in the witness of Jesus Christ . . . . [But] oftentimes we have failed to witness on Earth." S.A. 26 (prayer of August 16, 2010).

30

By portraying the failure to love Jesus or follow his teachings as spiritual defects, the prayers implicitly "signal[ed] disfavor toward" non-Christians. *Town of Greece*, 134 S. Ct. at 1826 (plurality opinion).

Multiple prayers characterized Christianity as "the one and only way to salvation," S.A. 15 (prayer of August 18, 2008), thus implying that adherents of other faiths were in some ways condemned. For example, one commissioner unequivocally stated that "we do believe that there is only one way to salvation, and that is Jesus Christ." S.A. 12 (prayer of December 3, 2007); *see also* S.A. 13 (prayer of February 18, 2008) ("I ask all these things in the name of Jesus, the one and only way to salvation.").

The record is replete with other invocations proclaiming that Christianity is exceptional and suggesting that other faiths are inferior. This message risks "denigrat[ing] nonbelievers [and] religious minorities." *Town of Greece*, 134 S. Ct. at 1823. Consider the following inexhaustive survey:

- "We have been blessed to be the recipients of your immeasurable grace. We can't be defeated, we can't be destroyed, and we can't be denied because we are going to live forever with you through the salvation of Jesus Christ. . . . And as we pick up the Cross, we will proclaim His name above all names, as the only way to eternal life." S.A. 33 (prayer of March 5, 2012).

- "We can't be defeated, we can't be destroyed, and we won't be denied, because of our salvation through the Lord Jesus Christ." S.A. 19 (prayer of May 18, 2009).

- "You saved us and you call us with the holy calling. We are the recipients of your immeasurable grace and glory. We are the richest people in the world. . . . [W]e're going to live forever with Him." S.A. 15 (prayer of June 2, 2008).

31

Finally, several prayers urged attendees to embrace Christianity, thereby "preach[ing] conversion." *Town of Greece*, 134 S. Ct. at 1823. One invocation advocated that the community take up the Christian faith:

> Father, I pray that all may be one as you, Father, are in Jesus, and He in you. I pray that they may be one in you, that the world may believe that you sent Jesus to save us from our sins. May we hunger and thirst for righteousness, be made perfect in holiness, and be preserved, whole and entire, spirit, soul, and body, irreproachable at the coming of our Lord Jesus Christ.

S.A. 21 (prayer of October 5, 2009). "Holy Spirit," went another prayer, "open our hearts to Christ's teachings, and enable us to spread His message amongst the people we know and love through the applying of the sacred words in our everyday lives." S.A. 28 (prayer of March 7, 2011).

Religious faith has both doctrinal and ecumenical features. The doctrinal aspects of religion, most often expressed in religious services, signify the ideas and rituals that make religions distinctive. Doctrine can lend strength, cohesion, comfort, and spiritual depth to religious communities. The ecumenical aspects of faith, by contrast, draw on the beliefs shared by many different creeds and "widely held among the people of this country." *Marsh*, 463 U.S. at 792. Central among these beliefs is faith in a higher providence that lends meaning and purpose to our life on earth and encourages us to embrace our common humanity and to strive for the best versions of ourselves. At its best, legislative prayer gives voice to the ecumenical dimensions of religious faith. Invocations that, like the above examples, hone too sharply in on doctrinal distinctions, risk "the divisiveness the Establishment Clause seeks rightly to avoid." *Simpson*, 404

32

F.3d at 284. Prayer that would be welcome and moving to the faithful in so many a setting ought to in some way become welcoming to others where the powers of government are implicated and persons of diverse faiths are involved.

Two serious harms arise "[w]hen the power [and] prestige . . . of government is placed behind a particular religious belief." *Engel*, 370 U.S. at 431. One is suffered by the individual. "A state-created orthodoxy puts at grave risk that freedom of belief and conscience which are the sole assurance that religious faith is real, not imposed." *Lee*, 505 U.S. at 592; *see Engel*, 370 U.S. at 429 ("[O]ne of the greatest dangers to the freedom of the individual to worship in his own way lay[s] in the Government's placing its official stamp of approval upon one particular kind of prayer . . . ."). The second injury is to the government itself. A well-founded perception that a government favors citizens subscribing to a particular faith would undermine the democratic legitimacy of its actions. *See Engel*, 370 U.S. at 431 ("[W]henever government had allied itself with one particular form of religion, the inevitable result had been that it had incurred the hatred, disrespect and even contempt of those who held contrary beliefs.").

By proclaiming the spiritual and moral supremacy of Christianity, characterizing the political community as a Christian one, and urging adherents of other religions to embrace Christianity as the sole path to salvation, the Board in its prayer practice stepped over the line. Concerns of this nature underlay Justice Jackson's enduring distillation of First Amendment values: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . ." *W. Va. State Bd. of Educ. v.*

33

*Barnette*, 319 U.S. 624, 642 (1943). This is no less true when orthodoxy reflects, as it did here, the most sincere manifestations of the most deeply held convictions.

C.

Before delivering their invocations, the commissioners told attendees to rise and often invited them to pray. *See, e.g.*, S.A. 12 (prayer of November 19, 2007) ("Let's pray together."); S.A. 26 (prayer of October 4, 2010) ("Please pray with me."); S.A. 37 (prayer of February 19, 2013) ("Let us pray."). Through these requests and the proselytizing invocations just discussed, the Board members "press[ed] religious observances upon their citizens." *Van Orden*, 545 U.S. at 683.

Justice Kennedy's plurality opinion in *Town of Greece* advises courts to assess whether the "principal audience" for the invocations is the lawmakers or the public. 134 S. Ct. at 1825. An internally-focused prayer practice "accommodate[s] the spiritual needs of lawmakers," *id.* at 1826, while an externally-oriented one attempts "to promote religious observance among the public," *id.* at 1825.

The invitations here fall "within the realm of soliciting, asking, requesting, or directing . . . of concern to the *Town of Greece* plurality." *Lund*, 103 F. Supp. 3d at 728. The lead dissent insists that the Rowan County "legislators themselves [were] the intended 'congregation' for legislative prayer." *Infra* Lead Dissent at 87. But the record makes clear that the commissioners were seeking audience involvement, not merely addressing fellow legislators. Indeed, it is difficult to imagine more probative evidence of a government's concern for the community's religiosity than a legislator's request that citizens join him in prayers that, for instance, ask "the world [to] believe that [God] sent

34

Jesus to save us from our sins." S.A. 21 (prayer of October 5, 2009). Because the invocations here placed Christianity on a higher plane than other faiths and urged attendees to embrace that religion, the requests to participate in those prayers are clear indicators of an effort "to promote religious observance among the public." *Town of Greece*, 134 S. Ct. at 1825 (plurality opinion).

*Town of Greece* involved similar requests, but the prayers in that case did not approach the degree of proselytization here and—even more important—the invitations "came not from town leaders but from the guest ministers, who presumably are accustomed to directing their congregations in this way." *Id.* at 1826. Justice Kennedy underscored that "[a]lthough board members themselves stood [or] bowed their heads," they "at no point solicited similar gestures by the public." *Id.*

From the perspective of the reasonable observer, this distinction matters. Such an observer is aware that phrases like "Let us pray" may be "for many clergy . . . almost reflexive." *Id.* at 1832 (Alito, J., concurring). But when these words are uttered by elected representatives acting in their official capacity, they become a request on behalf of the state. The invitations suggest that the lawmaker conceives of the political community as comprised of people who pray as he or she does.

The *Town of Greece* plurality expressly cautioned that "[t]he analysis would be different if *town board members* directed the public to participate in the prayers." *Id.* at 1826 (emphasis added). Yet Rowan County would have us approve such requests regardless of their source. *See* Supp. Br. of Appellant at 7 ("The Supreme Court saw no conflict between these introductions and the Establishment Clause."). Accepting this

argument would require us to blind ourselves to the very fact that the *Town of Greece* plurality regarded as relevant and perhaps even dispositive. In the end, the record speaks for itself: elected officials exhorted their constituents to participate in sectarian—and sometimes even proselytizing—religious exercises.

D.

Justice Kennedy's plurality opinion in *Town of Greece* instructs courts to consider "the setting in which the prayer arises." 134 S. Ct. at 1825. The prayers here were delivered at the public meetings of a local government body, a fact that makes the other aspects of the county's prayer practice even more questionable.

Relative to sessions of Congress and state legislatures, the intimate setting of a municipal board meeting presents a heightened potential for coercion. Local governments possess the power to directly influence both individual and community interests. As a result, citizens attend meetings to petition for valuable rights and benefits, to advocate on behalf of cherished causes, and to keep tabs on their elected representatives—in short, to participate in democracy. The decision to attend local government meetings may not be wholly voluntary in the same way as the choice to participate in other civic or community functions. Going to one's seat of government and going to one's place of worship are "very different forms of attendance." *Lund*, 837 F.3d at 437 (panel dissent).

In addition, the commissioners considered citizen petitions shortly after the invocation. Like other local governments, the Board exercises both legislative authority over questions of general public importance as well as a quasi-adjudicatory power over such granular issues as zoning petitions, permit applications, and contract awards. In

36

*Town of Greece*, the board apparently bifurcated its meetings into legislative and adjudicative portions. *See* 134 S. Ct. at 1829 (Alito, J., concurring). As Justice Alito explained in his concurrence, the prayer "preceded only the portion of the town board meeting that [was] essentially legislative." *Id.* Accordingly, the case did not "involve the constitutionality of a prayer prior to what may be characterized as an adjudicatory proceeding." *Id.*

In the parlance of Justice Alito's concurrence, Rowan County's Board intermingled its legislative and adjudicative business. On numerous occasions, adjudicatory proceedings were the first items up for consideration after the standard opening protocols. *See, e.g.*, J.A. 27 (agenda of November 5, 2007) ("Quasi-Judicial Public Hearing for PCUR 02-07 for Request by Nelson Lingle"); J.A. 105 (agenda of August 17, 2009) ("Quasi-Judicial Hearing for CUP 01-09 for Albert Ray Kepley"); J.A. 163 (agenda of February 21, 2011) ("Quasi-Judicial Hearing for SUP 01-11").

The "close proximity" between a board's sectarian exercises and its consideration of specific individual petitions "presents, to say the least, the opportunity for abuse." *Lund*, 837 F.3d at 436 (panel dissent). The plurality in *Town of Greece* recognized as much in advising courts to consider whether "town board members directed the public to participate in the prayers." 134 S. Ct. at 1826. This is not to suggest that the commissioners made decisions based on whether an attendee participated in the prayers. But the fact remains that the Board considered individual petitions on the heels of the commissioners' prayers.

Finally, the intimacy of a town board meeting may push attendees to participate in the prayer practice in order to avoid the community's disapproval. This is especially true where, as here, the government has aligned itself with the faith that dominates the electorate. Rowan County's commissioners always stood up and bowed their heads, as did most of the audience. Due to the Board's requests, the plaintiffs also felt compelled to stand so that they would not stand out. And as we noted, one person who spoke out against the Board's prayer practice was booed and jeered by her fellow citizens.

To be sure, citizens could time their arrival at the meeting to come after the prayer, leave the room before the prayer, or simply stay seated. But these options, such as they were, served only to marginalize. It is simply wrong to attribute discomfort with the situation here to hyper-sensitivity. Plaintiffs were placed in a situation that required them to decide "between staying seated and unobservant, or acquiescing to the prayer practice." *Lund*, 103 F. Supp. 3d at 732. What was forced upon plaintiffs at these meetings was "no trivial choice, involving, as it does, the pressures of civic life and the intimate precincts of the spirit." *Lund*, 837 F.3d at 437 (panel dissent).

There remains the question of what prayer practice in Rowan County would be a permissible one. We decline, however, to select one from among the various options available to defendant. Any future course of action is, and certainly would be in the first instance, for Rowan County to decide. The problematic features of the present practice noted in our decision should provide substantial guidance for whatever future steps the county may wish to take. The ultimate criterion is simply one of conveying a message of respect and welcome for persons of all beliefs and adopting a prayer practice that

38

advances "the core idea behind legislative prayer, 'that people of many faiths may be united in a community of tolerance and devotion.'" *Id.* at 438 (quoting *Town of Greece*, 134 S. Ct. at 1823).

IV.

We finally find unavailing the two primary arguments advanced in Rowan County's favor. To begin, the county urges this court to conduct a blinkered review of its prayer practice. The county first reduces the practice to its constituent elements, then finds that each element is not dispositive, and finally concludes that each element is therefore immaterial. *See, e.g.*, Supp. Br. of Appellant at 9 ("[F]our rights do not make a wrong. . . . [E]ach feature enumerated by plaintiffs is common to prayer practices observed in [other] legislatures . . . .").

But when a court looks to the totality of the circumstances to assess the constitutionality of a prayer practice, as the Supreme Court says we must, a fact may be relevant to the court's inquiry while not outcome-determinative. And by dissecting the prayer practice and subjecting each piece to an independent constitutional evaluation, the county's approach overlooks the crucial interaction between the elements. This mode of analysis simply fails to heed the Supreme Court's instruction that we examine "the prayer opportunity as a whole." *Town of Greece*, 134 S. Ct. at 1824.

The dissents do not even begin to consider the prayer practice here holistically. They address it piece by piece by piece. Unsurprisingly, they find each piece "standing alone [is] undoubtedly constitutional." *Infra* Lead Dissent at 76. Be that as it may, the citizens of Rowan County are not experiencing the prayer practice piece by piece by

39

piece. It comes at them whole. It would seem elementary that a thing may be innocuous in isolation and impermissible in combination. In fact, the lead dissent's tired "divide and conquer" strategy has been frowned upon by the Supreme Court itself. *See*, *e.g.*, *United States v. Arvizu*, 534 U.S. 266, 274 (2002) ("The court's evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the 'totality of the circumstances,' as our cases have understood that phrase. . . . [Precedent] precludes this sort of divide-and-conquer analysis.").

Second, we cannot discern any meaningful distinction between the commissioners and the Board. The lead dissent argues that "[t]here is no evidence that the Board, as a Board, had any role in any of the prayers given by any of the individual commissioners," who are "free agent[s] no different from the ministers in *Town of Greece* or the paid chaplain in *Marsh*." *Infra* Lead Dissent at 88. On this view, "it is only through [the] act of the deliberative body writing or editing religious speech that government would impermissibly seek 'to promote a preferred system of belief or code of moral behavior' with selected content." *Lund*, 837 F.3d at 421. (quoting *Town of Greece*, 134 S. Ct. at 1822). This reasoning proves too much. Such an approach would create a constitutional safe harbor for all prayers delivered by legislators "no matter how proselytizing, disparaging of other faiths, or coercive" so long as the legislature itself did not collectively compose the prayers. Supp. Br. of Appellees at 13-14 n.5.

Further, the attempted distinction between the members of the Board and the Board itself rests on a formalism that cannot withstand scrutiny. When one of Rowan County's commissioners leads his constituents in prayer, he is not just another private

40

citizen. He is the representative of the state, and he gives the invocation in his official capacity as a commissioner. His power to offer a prayer derives from this status; were he not a member of the Board, he would be barred from doing so. The commissioners themselves recognized as much. Invoking a recurrent theme in the prayer practice, one Board member observed: "[W]e're not here representing ourselves. Lord, we represent you and we represent the taxpayers of Rowan County." S.A. 16 (prayer of October 6, 2008). And unlike a guest minister, the commissioner remains on the scene to participate in the Board's decision-making. Finally, "it is hard to believe that a practice observed so uniformly over so many years was not by any practical yardstick reflective of board policy." *Lund*, 837 F.3d at 434 (panel dissent). In the context of Rowan County's prayer practice, there is no daylight between the individual commissioners and the Board of Commissioners.

## V.

The principle at stake here may be a profound one, but it is also simple. The Establishment Clause does not permit a seat of government to wrap itself in a single faith. But here elected officials took up a ministerial function and led the political community in prayers that communicated exclusivity, leaving members of minority faiths unwilling participants or discomforted observers to the sectarian exercises of a religion to which they did not subscribe. The solemn invocation of a single faith in so many meetings over so many years distanced adherents of other faiths from that representative government which affects the lives of all citizens and which Americans of every spiritual persuasion have every right to call their own.

41

If the prayer practice here were to pass constitutional muster, we would be hard-pressed to identify any constitutional limitations on legislative prayer. In arguing that the Establishment Clause would still retain vitality, the lead dissent writes that the Board members would still not be permitted to offer "prayers that implored the audience to attend a particular church" or to issue "official decisions based on whether a member of the public participated in, or voiced opposition to, the legislative prayer practice." *Infra* Lead Dissent at 98-99. Well of course such things would be wholly out of bounds. In setting such criteria however, the dissent unwittingly reveals it recognizes few realistic limits on public sectarian practice at all.

We recognize that dissents by their nature attempt to broaden majority opinions and portray them as doomsday propositions. But these dissents go well beyond even that. The lead dissent writes that the majority restricts all lawmakers to "only a generic prayer to a generic god." *Infra* Lead Dissent at 108. That assertion is incorrect. Any reading of the majority opinion reveals it as a straw man. This case involves one specific practice in one specific setting with one specific history and one specific confluence of circumstances. To extract global significance from such specificity is beyond a stretch.

In concluding that Rowan County's prayer practice is constitutionally infirm, we reiterate that legislator-led prayer can operate meaningfully within constitutional bounds. And "[n]othing about the constitutional drawbacks of Rowan County's prayer practice should be construed as disparaging the prayers themselves, which were moving and beautiful on many levels." *Lund*, 837 F.3d at 436 (panel dissent). But ruling in the county's favor would send us down a rancorous road. It would bear "unfortunate

42

consequences for American pluralism, for a nation whose very penny envisions one out of many, a nation whose surpassing orthodoxy belongs in its constitutional respect for all beliefs and faiths, a nation which enshrined in the First and Fourteenth Amendments the conviction that diversity in all of its dimensions is our abiding strength." *Id.* at 432.

A final word as to our two friends and valued colleagues in dissent. Judge Niemeyer's dissent seeks to characterize the majority opinion as anti-religious. *See infra* Niemeyer Dissent at 54 ("[T]he majority opinion's reasoning strikes at the very trunk of religion. . . ."); *id.* at 55 ("The majority's most basic error is its underlying assumption that the Establishment Clause is an *anti-religion* clause. . . ."). This suggestion may be easily dismissed. To reject the establishment of a single religious faith by the state is not to reject religion itself. *See Engel v. Vitale*, 370 U.S. 421, 435 (1962) ("It is neither sacrilegious nor antireligious to say that each separate government in this country should stay out of the business of writing or sanctioning official prayers and leave that purely religious function to the people themselves and to those the people choose to look to for religious guidance."). The Founders were able to distinguish between the importance of religion (the Free Exercise Clause) and the establishment of religion in a way that Judge Niemeyer refuses to do.[4]

The lead dissent, meanwhile, disparages the majority for its belief in an "ecumenical utopia" and its respect for the pluralistic nature of religious faith in our

---

[4] We do note that our colleague has flatly mischaracterized the majority opinion. Nowhere does it say or hold that "Rowan County's prayer practice [is] unconstitutional, essentially because the prayers were sectarian." *Infra* Niemeyer Dissent at 54.

43

country. *See infra* Lead Dissent at 97. If that be our sin, we shall gladly confess it. Localities enjoy wide discretion in designing a prayer practice, but those that do aspire to an ecumenical and pluralistic prayer opportunity should not have to suffer the scarcely concealed aspersions of "ecumenical utopias" and "generic gods" that some may cast upon them. In its eager acceptance of state-entwined religious orthodoxy, the lead dissent evokes an America that is not ours and never has been. It was in simple recognition of religious pluralism that the Founders adopted the Establishment Clause. *See* James Madison, Speech at the Virginia Ratifying Convention (June 12, 1788), in 11 The Papers of James Madison 130 (Robert Rutland et al. eds., 1977) ("[The] freedom [of religion] arises from that multiplicity of sects, which pervades America, and which is the best and only security for religious liberty in any society."). Had America been a monolithic religious entity, there would have been no need for the protection of religious diversity at all. Any thought that ecumenism and respect for religious pluralism would become disfavored in judicial quarters would have left the Founders saddened at what their First Amendment had become.

Our Constitution seeks to preserve religious liberty without courting religious animosity. In this quest, our two religion clauses have been a great success, helping to spare Americans the depth of religious strife that so many societies have had to suffer and endure. And yet free religious exercise can only remain free if not influenced and directed by the hand of the state. On this score, the county simply went too far. The First Amendment in the end is not either/or, but both/and. Believing that free religious exercise

in Rowan County may likewise further the values of religious welcome and inclusion, we affirm the judgment of the district court.

*AFFIRMED*

DIANA GRIBBON MOTZ, Circuit Judge, concurring:

I concur in full with the majority opinion. I write separately to emphasize that our decision today fully comports with *Marsh v. Chambers*, 463 U.S. 783 (1983), *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014), and the history of the Establishment Clause itself.

## I.

The Constitution forbids a legislative body from using its prayer opportunity to advance one religion or set of religious beliefs to the exclusion of others. *See Town of Greece*, 134 S. Ct. at 1823; *Marsh*, 463 U.S. at 794–95. This rule derives from "[t]he clearest command of the Establishment Clause," namely, "that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). The most obvious way to show a preference for one religion is publicly to profess faith in its teachings. The Constitution fiercely protects this type of expression by individual citizens. But for the government, the Constitution absolutely forbids it. *See, e.g.*, *Epperson v. Arkansas*, 393 U.S. 97, 103–04 (1968).

This remains the law, and neither *Marsh* nor *Town of Greece* exempts prayer made before a legislative body from this rule. Rather, those cases simply hold that a legislative body may participate in some limited forms of religious activity without officially taking sides or appearing to do so.

In *Marsh*, the Supreme Court concluded that the Nebraska Legislature did not abandon official neutrality by employing a chaplain of one particular religious

46

denomination to invoke divine guidance before a legislative session. *See* 463 U.S. at 793–95. In so holding, the Court rightly deferred to the Framers' judgment about this type of government involvement with religion. *See id.* at 790–91. However, the *Marsh* Court plainly did not abandon or make an exception to the Establishment Clause's basic commitment to neutrality. Instead, the Court ultimately approved the Legislature's practice because it found "no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Id.* at 794–95.

In *Town of Greece*, the Court held that a legislative body's chaplain-led prayer could include sectarian content. 134 S. Ct. at 1823. Thus, the town board in that case did not impermissibly prefer one religion over another simply because volunteer chaplains spoke in a particular religious idiom. To hold otherwise, the Court reasoned, would require legislatures and courts to "act as supervisors and censors of religious speech," which would entangle government with religion far more than a rule allowing a prayer-giver to draw on his private religious beliefs. *Id.* at 1822. Reviewing the town's practice as a whole, the Court concluded that no other features of the town's rotating system of volunteer chaplains, all recruited in a non-discriminatory manner from local congregations, advanced one religion to the exclusion of others. *See id.* at 1824.

Thus, *Marsh* and *Town of Greece* provide a guidepost for resolving the case at hand. If the Board's practice sends the message that it prefers or accepts the teachings of one religion over others, it violates the Constitution. If the practice simply allows a prayer-giver to espouse his own private religious beliefs when helping to solemnize the Board's meetings, it does not.

47

Of course, resolving whether a given practice violates the Establishment Clause requires us to engage in a sensitive "interpretation of social facts." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 315 (2000) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 694 (1984) (O'Connor, J., concurring)). Yet some clear boundaries exist. For example, neither *Marsh*, nor *Town of Greece*, nor any other case suggests that a legislative body may begin each and every one of its meetings by reciting a particular religion's creed. It does not matter whether that creed is the *Shahada* of Islam, the Triple Gem of Buddhism, a recitation from the Vedas or other *shruti* sacred to Hinduism, the Wiccan Rede, the *Shema Yisrael* of Judaism — or the Apostle's Creed of Christianity.

If members of a legislative body recited one religion's creed month after month, year after year, allowing no opportunity for members of any other religion to lead a prayer, a reasonable observer could only conclude that the legislative body preferred that religion over all others. *See Engel v. Vitale*, 370 U.S. 421, 430 (1962) ("There can be no doubt that New York's state prayer program officially establishes the religious beliefs embodied in the Regents' prayer," even though the prayers were optional for students.). If a practice like this does not violate the Establishment Clause, nothing would prevent that legislature from passing a statute, ordinance, or resolution declaring a particular faith the true religion. No principled distinction exists between a legislative body's proclaiming, for example, Christianity's status as the one true religion in a written instrument and professing that it is so — over and over again with no room for an alternative viewpoint — during public meetings. Both constitute state action. *See Turner*

48

*v. City Council of Fredericksburg*, 534 F.3d 352, 354–55 (4th Cir. 2008) (O'Connor, J.). And both convey the message of government preference for one religion over all others.

In this case, for all the reasons set forth in the majority opinion, the Board's practice sends the same message as the Apostle's Creed. The undisputed record evidence renders untenable Rowan County's contention that the Commissioners were simply espousing their own personal religious beliefs. In over five years, the Board made no disclaimers and adopted no official policies to that effect. Moreover, the prayers themselves were typically phrased using first-person plural pronouns like "we" and "our," undermining any suggestion that the prayers were simply personal petitions. Nor is the conclusion Rowan County would have us draw apparent from the overall context of the prayers. In sum, nothing about the Board's practice would lead a reasonable observer to conclude that the Commissioners spoke only as individuals, rather than speaking for the legislative body representing the people of Rowan County. *Cf. Joyner v. Forsyth Cty.*, 653 F.3d 341, 344 (4th Cir. 2011) (noting the board's formal written policy that its prayers were "not intended . . . to affiliate the Board with, nor express the Board's preference for, any faith or religious denomination").

Given the Commissioners' role in the prayer practice, the exclusivity of those prayers, the uniformity of the Christian message found in nearly every prayer, the frequency of these sectarian prayers, the degree of sectarian content in the prayers, the long duration of the prayer practice, and the reactions to the objections of non-Christian residents, a reasonable observer would conclude that the Board had placed its imprimatur on Christianity. In fact, a reasonable observer could not conclude otherwise.

## II.

Nor can the historical practice of the First Congress save the Board's practice. Of course, to the extent we can discern it, the Framers' understanding of what constitutes permissible religious activity by the government serves as highly probative evidence of what the Establishment Clause allows and what it forbids. *See Marsh*, 463 U.S. at 790–91. Courts consider the Framers' understanding probative because they drafted the First Amendment and sent it on to the states for ratification. As such, it is unlikely that the Establishment Clause forbids a practice the First Congress engaged in or permits a practice it eschewed. For this very reason, the *Marsh* Court found it significant that the First Congress employed chaplains to deliver opening prayers, explaining that "[i]t can hardly be thought" the Framers "intended the Establishment Clause of the Amendment to forbid what they had just declared acceptable." *Id.* at 790.

Study of the practice of the First Congress thus serves as a useful interpretive tool in legislative prayer cases, but this tool can easily be misused. One way to misuse it is to claim that a practice dating back to the First Congress justifies a significantly different modern practice. That is precisely what Rowan County and its supporting amici attempt to do here. They shoehorn the legislator-led prayer at issue in this case into the tradition begun by the First Congress. But examination of the practice of the First Congress shows that it provides no support at all for the Board's prayer practice. Rowan County and its supporting amici do not cite a single authority suggesting that the First Congress engaged in a practice similar to the one at issue — that is, having one of its own members deliver

50

the opening prayer. Perhaps most notably, my dissenting colleagues cannot cite any such authority either.

This stands to reason. A search of the Journals of House and Senate from 1789 to 1791, the official contemporaneous records of the proceedings in the First Congress, and the Annals of Congress, which were compiled later from the best available sources from that time period, does not yield even one example of legislator-led prayer during the First Congress. The Framers apparently relied exclusively on chaplain-led prayer to solemnize their proceedings. Of course, this does not establish that legislator-led prayer is unconstitutional, but it does preclude any argument that legislator-led prayer must be constitutional because the First Congress approved of it.

Rather than cite historical evidence that is truly probative of the meaning of the Establishment Clause, the principal dissent relies on recent instances of legislator-led prayer in Congress, none of which occurred before 1973; the contemporary practices of state and local legislatures; the practice of the South Carolina Provincial Congress; and a vague, citation-free statement from the late Senator Robert C. Byrd that senators have given the opening prayer "from time to time." *See* 2 Robert C. Byrd, *The Senate 1789 – 1989: Addresses on the History of the United States Senate* 305 & 647 n.17 (Wendy Wolff ed., 1991) (citing two resolutions as support for a different proposition). In the historical analysis endorsed by the *Marsh* Court, this is very thin gruel. And it is certainly no substitute for the Framers' own practice and understandings.

Furthermore, the limits the Framers imposed on their own practice of chaplain-led prayer provide significant evidence of what they believed to be the dividing line between

51

permissible and impermissible legislative prayer. By the standards of an overwhelmingly Protestant society, the First Congress took pains to ensure that its own legislative prayer practice remained religiously neutral, both in appearance and in practice. As one of its very first orders of business, the House and Senate formed committees "to take under consideration the manner of electing Chaplains." S. Journal, 1st Cong., 1st Sess. 10 (1789). On April 15, 1789, the Senate committee reported back with a proposed resolution:

> That two Chaplains, *of different denominations*, be appointed to Congress, for the present session, the Senate to appoint one, and give notice thereof to the House of Representatives, who shall, thereupon, appoint the other; which Chaplains shall commence their services in the Houses that appoint them, *but shall interchange weekly*.

*Id.* at 12 (emphases added); *see also Marsh*, 463 U.S. at 793 n.13. The Senate adopted the resolution, S. Journal, 1st Cong., 1st Sess. 12 (1789), and the House concurred two days later, H.R. Journal, 1st Cong., 1st Sess. 16 (1789). The Senate went on to elect Samuel Provoost, an Episcopalian bishop, as its first chaplain, and the House in turn elected William Linn, a Presbyterian minister. S. Journal, 1st Cong., 1st Sess. 16 (1789); H.R. Journal, 1st Cong., 1st Sess. 26 (1789).[*]

This history surely reflects the Framers' concern with avoiding even a suggestion that Congress subscribed to the tenets of a single religion. I can discern no other reason

---

[*] This rule stood without interruption for the next sixty-one years. Along the way, Congress rejected proposals that would have omitted or specifically struck the "of different denominations" language in 1800, 1810, 1845, 1846, and 1847. S. Journal, 6th Cong., 2d Sess. 109 (1800); S. Journal, 11th Cong., 3d Sess. 526 (1810); H.R. Journal, 11th Cong., 3d Sess. 441 (1810); H.R. Journal, 29th Cong., 1st Sess. 72 (1845); H.R. Journal, 29th Cong., 2d Sess. 52 (1846); H.R. Journal, 30th Cong., 1st Sess. 59 (1847).

why the House and Senate would have bound themselves to select chaplains of different denominations *and* to rotate their chaplains so often. The Framers understood that legislative prayer, even when led exclusively by chaplains, can be just as dangerous as other forms of government-sponsored religious activity unless measures are taken to avoid a sectarian preference, or even the appearance of one.

The Board's practice in the case at hand simply does not fit the tradition of legislative prayer the First Congress began. In the aggregate, the Board's practice amounts to an advancement of the tenets of a preferred religion. The members of the First Congress, who were far less acquainted with religious diversity than we are today, managed to avoid this, and they fashioned their own prayer practice to do so. Surely, Rowan County can do the same.

### III.

The Supreme Court has not disavowed the fundamental rule that a legislative body may not use its prayer opportunity to promote or affiliate itself with one religion to the exclusion of others. If the Board's practice does not violate this rule, then I cannot imagine what does.

Judge Keenan and Judge Harris have authorized me to indicate that they join in this concurring opinion.

53

NIEMEYER, Circuit Judge, with whom Judge SHEDD joins, dissenting:

I am pleased to concur in Judge Agee's fine opinion, which carefully and faithfully applies the Supreme Court's recent decision in *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014). I write separately to focus on how the majority opinion, beyond simply sidestepping *Town of Greece*, actively undermines the appropriate role of prayer in American civic life. While it pays lip service to controlling law, it nonetheless seeks to avoid it and to reinstate instead the holding in *Joyner v. Forsyth County*, 653 F.3d 341 (4th Cir. 2011), which was squarely overturned by *Town of Greece*.

I

In finding Rowan County's prayer practice unconstitutional, essentially because the prayers were sectarian, the majority opinion's reasoning strikes at the very trunk of religion, seeking to outlaw most prayer given in governmental assemblies, even though such prayer has always been an important part of the fabric of our democracy and civic life.

The history of prayer practice in governmental assemblies is well documented both by the Supreme Court in its decisions in *Marsh v. Chambers*, 463 U.S. 783 (1983), and *Town of Greece* and by the amicus brief submitted in this case by several States, which demonstrates that the practice is an important reflection of the values underlying both the Free Exercise and Establishment Clauses of the U.S. Constitution. By ignoring these values, the majority is able to mischaracterize and thus misapply those constitutional provisions.

54

The majority's most basic error is its underlying assumption that the Establishment Clause is an *anti-religion* clause that exists in tension with the Free Exercise Clause. This, however, misunderstands the Establishment Clause's role. In his seminal book on the subject, Philip Hamburger details how the Establishment Clause was actually included in the Constitution *to enhance* the free exercise of religion by prohibiting establishments that favored one religion to the detriment of others:

> These established churches (Episcopal in the southern states and Congregationalist in most New England states) were established through state laws that, most notably, gave government salaries to ministers on account of their religion. Whereas the religious liberty demanded by most dissenters was a freedom from the laws that created these establishments, the separation of church and state was an old, anticlerical, and, increasingly, antiecclesiastical conception of the relationship between church and state. As might be expected, therefore, separation was not something desired by most religious dissenters or guaranteed by the First Amendment. Indeed, it was quite distinct from the religious liberty protected in any clause of an American constitution, whether that of the federal government or that of any state.

> \* \* \*

> The religious dissenters who participated in the campaign against establishments and whose claims seem to have affected the wording of the constitutional guarantees against establishments made demands for a religious liberty that limited civil government, especially civil legislation, rather than for a religious liberty conceived as a separation of church and state. Moreover, in attempting to prohibit the civil legislation that would establish religion, they sought to preserve the power of government to legislate on religion in other ways.

Philip Hamburger, *Separation of Church and State* 10, 107 (2002).

Hamburger thus details how the Establishment Clause was designed to enable the presence of religion in civic life without impairing the religious diversity central to the

55

Republic. This is a far different understanding than that assumed by the majority, in which the Establishment Clause is designed to erect barriers around public life through which expressions of faith are not allowed. The majority seems to understand religious freedom as freedom *from* religion, not as the freedom to practice religion openly in all aspects of American life.

The free exercise of religion, including prayer practice, as *enhanced* by the prohibition of establishments, has been recognized as profoundly important to the vitality of American democracy and liberty — an important aspect of the Founders' genius. In his magnum opus *Democracy in America*, Alexis de Tocqueville observed about America in the 1830s:

> [A] democratic and republican religion . . . contributed powerfully to the establishment of a republic and a democracy in public affairs; and from the beginning, *politics and religion contracted an alliance* which has never been dissolved.

1 Alexis de Tocqueville, *Democracy in America* at 311 (Henry Reeve trans., Vintage Books 1960) (emphasis added). Tocqueville explained the benefit of the relationship, observing that "despotism may govern without faith, but liberty cannot. Religion is much more necessary in the republic . . . than in the monarchy." *Id.* at 318. The theoretical basis underpinning this observation was that "religion sustains a successful struggle with that spirit of individual independence which is her most dangerous opponent." 2 *id.* at 29.

And this deeply grounded balance of democracy, religion, and freedom is well recognized in our jurisprudence, as eloquently and unambiguously related in Supreme

56

Court cases. For instance, in *Marsh v. Chambers*, when the Court evaluated the practice of legislative prayer, its analysis was rooted in the Founders' recognition of the practice's value. The Court observed, "The opening of sessions of legislative and other deliberative public bodies with prayer is *deeply embedded* in the history and tradition of this country. From colonial times through the founding of the Republic and ever since, *the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom.*" *Marsh,* 463 U.S. at 786 (emphasis added). In light of this history, the Court accepted "the interpretation of the First Amendment draftsmen who saw no real threat to the Establishment Clause arising from a practice of prayer." *Id.* at 791. It concluded that "there can be no doubt that the practice of opening legislative sessions with prayer has become part of *the fabric of our society*." *Id.* at 792 (emphasis added).

In *Town of Greece*, the Court echoed these sentiments, stressing the value of faith expression in public life. As the Court recognized, "That the First Congress provided for the appointment of chaplains only days after approving language for the First Amendment demonstrates that the Framers considered legislative prayer *a benign acknowledgment of religion's role in society.*" *Town of Greece*, 134 S. Ct. at 1819 (emphasis added). The Court stated that any test under the Establishment Clause "must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Id.* After all, any "test that would sweep away what has so long been settled would create new controversy and begin anew the very divisions along religious lines that the Establishment Clause seeks to prevent." *Id.*

57

Simply put, there is no ambiguity in the historical role and importance of legislative prayer in civic life.  In both *Marsh* and *Town of Greece*, the Court was entirely clear about this.  And, in each case, the Court took pains to mention that the Establishment Clause was intended to protect, rather than constrain, public expression of religious faith.

The majority refuses to recognize the importance of religion — and of legislative prayer in particular — to democracy and American civic life.  And its decision to "pay close attention to the interplay between the various facets of the County's prayer practice" to assess whether it is too sectarian, *ante* at 23, unwisely inserts government into the role of regulating faith expression in precisely the way the Establishment Clause was intended to forbid.  To be sure, prayer practice can be misused, rendering it unprotected, when it denigrates or interferes with the religious practice of others.  But short of those abuses, it ought not to be subject to the scrutiny and skepticism with which it is met by the majority.  The proper respect for a practice so venerated and important to our democratic order does not include the niggling of civil courts assessing whether the practice "pointedly" invokes a particular name of the Divine to bless and solemnize the governmental proceeding.  *Ante* at 4.  In carrying out its self-assigned mission to police Rowan County's prayer practice, the majority turns its back on the historical role and values of religion and prayer, as well as the principles of *Town of Greece*, and recasts the law and facts to serve its mission.

II

In order to advance its theory of the Establishment Clause, the majority opinion brushes past *Town of Greece* through an attempt to distinguish it. This effort relies on the distinction that the case before us involves invocations given by the legislators, while *Town of Greece* involved prayers given by chaplains, and then concludes casually that this difference takes this case "well outside the confines of *Town of Greece.*" *Ante* at 21. Having found that handle, the majority then considers itself absolved of precedent and free to launch its own freestanding analysis.

A closer look at the distinction of which the majority makes so much, however, demonstrates that its analysis is nothing but a loosely disguised rationalization adopted to open the way to its new approach. The fact that the prayer-giver in Rowan County was a commissioner, not a minister designated or hired by the Board of Commissioners, resonates with nothing in *Town of Greece*, nor has anything outside of the majority opinion itself ever suggested that the status of the person giving an invocation is material to the constitutional analysis. Indeed, the Court has never specified which individuals are allowed to pray publicly. On the contrary, both *Marsh* and *Town of Greece* teach that the purpose of legislative prayer "is largely to accommodate the spiritual needs of lawmakers," *Town of Greece*, 134 S. Ct. at 1826. It is thus not surprising that the historical facts of the long-standing tradition of prayer practice at governmental assemblies show that prayer-givers can include governmental officials or members of the assembly. In the U.S. Congress, for example, prayers have been given not only by the hired Chaplain, but also by Members of Congress. Similarly, the amicus brief filed by

59

the States shows that a *majority* of state and territorial legislators rely on *lawmaker-led* invocations. And they show the same is true for local governments, where the practice of government officials giving the invocations is widespread.

The majority's pro forma distinction of *Town of Greece* can only be driven by its desire to reach a different end, because the nature of Rowan County's prayer practice is, in all aspects of plaintiffs' complaints, virtually indistinguishable from the practice upheld by the Supreme Court in *Town of Greece*. As Judge Agee shows in detail, *Town of Greece* upheld the prayer practice in the context of a small local political assembly, as is the case here; *Town of Greece* upheld prayers primarily invoking Jesus and other Christian elements, as is the case here; *Town of Greece* upheld the request to stand for prayer, as is the case here; and *Town of Greece* rejected the complaints about the prayers being "offensive, intolerable, and an affront to a diverse community," 134 S. Ct. at 1817 (internal quotation marks omitted), as made by the plaintiffs here. The *Town of Greece* Court also rejected the argument, which the majority embraces here, that it was the totality of these elements that offended the Establishment Clause.

To advance its mission under the banner of the Establishment Clause, the majority opinion also spins the facts to suggest that Rowan County is, through some unwritten agreement of its Commissioners, coercing its citizens to pray Christian prayers. It states that the prayer practice *was designed* "to identify the government with Christianity"; that the five Commissioners "maintained *exclusive and complete control* over the content of prayers"; that the Commissioners *agreed* on the prayer "featuring but a single faith"; and that the prayer was "*pointedly* sectarian." *Ante* at 4, 10, 20, 4 (emphasis added and

60

citations omitted). The record, however, simply does not support any such suggestion of coercion, exclusion, or agreement.

Rather, under the practice of Rowan County, as set forth in the record, one of the five Commissioners, in rotation, gives a brief invocation according to that Commissioner's individual discretion, without any prestanding instruction or understanding about the content or nature of the invocation. Each Commissioner has affirmed by affidavit that the nature and composition of the invocation — or indeed a moment of silence — is left entirely to the discretion of the Commissioner and that there is no policy — written or unwritten — "regarding the form or content of any commissioner's Invocation." And each has stated that the invocation is given "for the edification and benefit of the commissioners and to solemnize the meeting." The fact that the prayers were Christian in nature only reflected each prayer-giver's religion, not some design, policy, or agreement of the Commissioners.

Thus, evading the lessons of *Town of Greece* and armed with recharacterized facts, the majority conducts its own analysis, based in large part on isolated quotations from the author's own opinions, either in dissent or overruled, or from the very district court opinion it is reviewing in this case. This approach amounts simply to a barely disguised disagreement with the Supreme Court's support of sectarian legislative prayer in *Town of Greece*.

# III

The reason behind the majority's wayward approach is not a total mystery. Judge Wilkinson, writing for the majority, and the ACLU, representing the plaintiffs, have acted with harmonious parallelism, both having sought to circumvent the application of *Town of Greece*, and to return to the principles of *Joyner v. Forsyth County*, which *Town of Greece* overruled.

In February 2012, the ACLU complained to the Rowan County Commissioners about the "practice of convening Board meetings with *sectarian prayer*, *particularly Christian prayers*," (emphasis added), and, to support its position, quoted Judge Wilkinson's opinion in *Joyner*, which held that legislative prayer is appropriate "only when it is nonsectarian," 653 F.3d at 345, and that, in order to embrace a nonsectarian ideal, States and local governmental entities must be "proactive in discouraging *sectarian prayer* in public settings," *id.* at 353 (emphasis added). Then, shortly after the decision in *Town of Greece* was handed down, the ACLU announced, "This morning, the Supreme Court issued a *disappointing and troubling decision* upholding a town board's practice of opening its meetings with Christian prayers." Heather L. Weaver, *Supreme Court Turns Blind Eye to Exclusionary Prayers at Government Meetings*, ACLU (May 5, 2014, 2:57 PM), https://perma.cc/2UGE-5TNL.

Similarly, in his dissent in this case from the panel's application of *Town of Greece* to uphold Rowan County's prayer practice, Judge Wilkinson lamented that the prayers in this case were "*uniformly sectarian*, referencing one and only one faith." 837 F.3d 407, 431 (4th Cir. 2013) (Wilkinson, J., dissenting) (emphasis added). He

62

continued, "I have seen nothing like it," *id*., even though *Town of Greece* explicitly upheld uniformly sectarian prayer made in the tradition of only one faith. In this dissenting opinion, Judge Wilkinson essentially sought to return to his own earlier opinion in *Joyner*, where he had held that opening a meeting with *sectarian* prayer violated the Establishment Clause because the prayers "referred to Jesus, Jesus Christ, Christ, or Savior with overwhelming frequency." *Joyner*, 653 F.3d at 349 (internal quotation marks omitted). His panel dissent thus concluded that, "[t]he desire of this fine county for prayer at the opening of its public sessions can be realized in *non-denominational* prayer." *Lund*, 837 F.3d. at 437 (Wilkinson, J., dissenting) (emphasis added) (adopting the ACLU's position that *sectarian* prayer was unconstitutional). But again, these very conclusions were overruled in *Town of Greece*, which upheld *uniformly sectarian* prayer given at similar local governmental meetings.

The positions taken by the ACLU and Judge Wilkinson, while uncannily harmonious with each other, are starkly at odds with *Town of Greece*, *relying on the very arguments rejected* by the Supreme Court in both *Marsh* and *Town of Greece*. In *Marsh*, the Court rejected arguments based on the facts (1) that the legislative prayer was given by a clergyman of only one denomination for 16 years; (2) that public funds were used to pay for the services of the prayer-giver; and (3) that the prayers were in a single faith tradition. And in *Town of Greece*, the Court rejected arguments based on the facts (1) that the prayers were given disproportionately by Christians; (2) that this disparity effectively sponsored sectarian prayers, given predominantly in the name of Jesus; (3) that the prayer givers began by asking the audience to stand and by saying, "Let us

63

pray"; and (4) that the totality of the circumstances "conveyed the message that Greece was endorsing Christianity."  134 S. Ct. at 1818.  Reading the majority opinion here in light of *Town of Greece*, one could well believe that Justice Kagan's dissent was in fact controlling.

*     *     *

At bottom, there simply is no constitutional defect in the prayer practice followed by Rowan County, and the majority's effort to find it unconstitutional, despite *Town of Greece*, is, I respectfully suggest, aberrational.

AGEE, Circuit Judge, with whom Judge Niemeyer, Judge Traxler, Judge Shedd, and Judge Diaz join, dissenting:

The majority holds that the Rowan County Board of Commissioners' practice of opening its public meetings with a commissioner-led invocation violates the Establishment Clause. That decision is irreconcilable with *Marsh v. Chambers*, 463 U.S. 783 (1983), and *Town of Greece v. Galloway*, 572 U.S. __, 134 S. Ct. 1811 (2014). Therefore, I respectfully dissent.

## I.[1]

Rowan County, North Carolina, exercises its municipal power through an elected Board of Commissioners ("the Board"), which typically holds public meetings twice a month. For many years, the Board has permitted each commissioner, on a rotating basis, to offer an invocation before the meetings.[2]

Typically, the Board chair would call the meeting to order and invite the other commissioners and public audience to stand for the ceremonial opening. A designated commissioner would then offer an invocation of his or her choosing followed by the Pledge of Allegiance. The content of each invocation was entirely in the discretion of the respective commissioner; the Board neither composed the prayer nor policed its content. The prayers frequently, though not invariably, invoked the Christian faith. For example,

---

[1] At times, this opinion parallels language used in the now-withdrawn panel majority opinion. *Lund v. Rowan Cty.*, 837 F.3d 407 (4th Cir. 2016), *reh'g en banc granted*, 670 F. App'x 106 (4th Cir. 2016).

[2] The record does not reflect that the Board adopted a written policy regarding the invocations, but it followed a relatively routine practice.

after beginning the prayers with some variant of "let us pray" or "please pray with me," the prayer givers often referred to "Jesus," "Christ," and "Lord." *E.g.*, Suppl. J.A. 36–37.[3] Although not required to do so, most of the public audience joined the commissioners in standing for the invocation and the Pledge of Allegiance. Once this ceremonial part of the meeting concluded, the Board turned to its public business.

Rowan County residents Nancy Lund, Liesa Montag–Siegel, and Robert Voelker (collectively, "Plaintiffs") filed a complaint in the U.S. District Court for the Middle District of North Carolina "to challenge the constitutionality of [the Board's] practice of delivering sectarian prayer at meetings." J.A. 10. Plaintiffs alleged that the prayer practice unconstitutionally affiliated the Board with one particular faith and caused them to feel excluded as "outsiders." J.A. 12. In addition, they alleged that the overall atmosphere was coercive, requiring them to participate so they "would not stand out," Suppl. J.A. 2, or otherwise be singled out in a manner they speculated might negatively affect business before the Board.

Plaintiffs sought a declaratory judgment that the Board's prayer practice violated the Establishment Clause, along with an injunction preventing any similar future prayers. Plaintiffs successfully obtained a preliminary injunction based on now-abrogated case law from this Court which had held that sectarian legislative prayer violated the Establishment Clause. *See Joyner v. Forsyth Cty.,* 653 F.3d 341, 348 (4th Cir. 2011) (explaining that our decisions "hewed to [the] approach[ of] approving legislative prayer

---

[3] This opinion omits internal marks, alterations, citations, emphasis, and footnotes from quotations unless otherwise noted.

only when it is nonsectarian in both policy and practice"), *abrogated by Town of Greece*, 134 S. Ct. 1811.  The Supreme Court then issued its decision in *Town of Greece*, which held that sectarian legislative prayer was constitutional.  134 S. Ct. at 1815, 1820, 1824.

In the wake of *Town of Greece*, the parties filed cross-motions for summary judgment.  Although the district court granted the Plaintiffs' motion, it first recognized that *Town of Greece* "repudiated" and "dismantl[ed] the Fourth Circuit's legislative prayer doctrine [that had] developed around the core understanding that the sectarian nature of legislative prayers was largely dispositive" of its constitutionality.  *Lund v. Rowan Cty.*, 103 F. Supp. 3d 712, 719, 721 (M.D.N.C. 2015).  Nonetheless, the district court concluded that "[s]everal significant differences" between *Town of Greece* and this case—including the identity of the prayer givers and the invitation to the public to stand—rendered the Board's practice unconstitutional.  *Id.* at 724.

II.

As the majority acknowledges, this case requires a case-specific evaluation of all the facts and circumstances.  *See Lynch v. Donnelly*, 465 U.S. 668, 678–79 (1984) (observing that the Establishment Clause cannot be applied mechanistically to draw unwavering, universal lines for the varying contexts of public life).  Those facts and circumstances must be viewed through the lens of the Supreme Court's prior legislative prayer decisions, including both its broader explications of what legislative prayer practices are permissible and its narrower applications of those principles to the facts

67

presented in those cases. So, before turning to the facts and circumstances of this case, it's important to review the first principles from *Marsh* and *Town of Greece*.

Though legislative prayer is government speech touching on religion, *Turner v. City Council of Fredericksburg*, 534 F.3d 352, 354 (4th Cir. 2008), the Supreme Court has not relied on traditional Establishment Clause analysis to assess its constitutionality. *See Marsh*, 463 U.S. at 792. Legislative prayer is its own genre of Establishment Clause jurisprudence, assessed under a different framework that takes the unique circumstances of its historical practice and acceptance into account. *See Town of Greece*, 134 S. Ct. at 1818 ("*Marsh* is sometimes described as 'carving out an exception' to the Court's Establishment Clause jurisprudence, because it sustained legislative prayer without subjecting the practice to any of the formal tests that have traditionally structured this inquiry.").

The Supreme Court first articulated this approach in *Marsh*, which involved a challenge to the constitutionality of the Nebraska legislature's practice of having a paid chaplain offer a prayer to open each legislative session. Recounting the long-standing American tradition of opening legislative sessions with prayer, the Supreme Court traced the history of legislative prayer "[f]rom colonial times through the founding of the Republic and ever since." *Marsh*, 463 U.S. at 786.

The Court ascribed particular significance to the views of the First Congress, which, "as one of its early items of business, adopted the policy of selecting a chaplain to open each session with prayer." *Id.* at 787–88. The Senate and House, in turn, appointed official chaplains in 1789. *Id.* at 788. Placing great significance on these events, the

68

Court explained those acts reflected how legislative prayer fit into the Founders' understanding of the Establishment Clause: "It can hardly be thought that . . . they intended the Establishment Clause . . . to forbid what they had just declared acceptable." *Id.* at 790. "This unique history [led the Court] to accept the interpretation of the First Amendment draftsmen who saw no real threat to the Establishment Clause arising from [the] practice of [legislative] prayer[.]" *Id.* at 791.

Having upheld the constitutionality of legislative prayer in general, the *Marsh* Court next considered whether Nebraska's practice fell within the bounds of the First Amendment. In particular, the Court considered the plaintiff's specific challenges to three characteristics of Nebraska's legislative prayer practice: (1) the State had selected a representative of "only one denomination" for sixteen years; (2) the chaplain was a paid state employee; and (3) his prayers were offered "in the Judeo–Christian tradition." *Id.* at 792–93.

The Court rejected each claim. First, the Court observed that the First Congress "did not consider opening prayers as a proselytizing activity or as symbolically placing the government's official seal of approval on one religious view." *Id.* at 792. Next, it noted that there was no evidence that the chaplain's long tenure "stemmed from an impermissible motive," and thus his continuous appointment did "not in itself conflict with the Establishment Clause." *Id.* at 793–94. That the chaplain was paid from public funds was similarly "grounded in historic practice" and thus not prohibited. *Id.* at 794. Lastly, as for the content of the prayers, the Court explained it was "not of concern" because "there is no indication that the prayer opportunity has been exploited to

proselytize or advance any one, or to disparage any other, faith or belief." *Id.* at 794–95.

Accordingly, the Court declined "to parse the [prayer] content." *Id.* at 795.

In *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 578–79, 602 (1989), a case about the constitutionality of two religious holiday displays located on public property, the Court referred in dicta to its prior holding in *Marsh,* observing that "[t]he legislative prayers involved in *Marsh* did not violate [the Establishment Clause] because the particular chaplain had removed all references to Christ." *Id.* at 603. In additional dicta, the Court observed that "not even the unique history of legislative prayer can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief." *Id.*

Whatever fleeting persuasiveness that dicta merited, the Supreme Court unequivocally rejected it in *Town of Greece*. There, the Court explicitly disavowed any constitutional requirement that legislative prayers be nonsectarian to comply with the Establishment Clause: "An insistence on nonsectarian or ecumenical prayer as a single, fixed standard is not consistent with the tradition of legislative prayer outlined in [our] cases." *Town of Greece*, 134 S. Ct. at 1820.

The Town of Greece, New York, Board opened its monthly legislative meetings with an invocation delivered by volunteer clergy. Guest chaplains were found by placing calls to congregations listed in a local directory. *Id.* at 1816. Nearly all of these churches were Christian, as were the guest clergy. Most of the invocations referenced the Christian faith, but the Town Board was not aware of the prayer content beforehand, nor did it attempt to edit the content of the prayer or otherwise instruct the prayer giver on

70

what to say. *Id.* Though the Second Circuit concluded that this "steady drumbeat of Christian prayer . . . tended to affiliate the town with Christianity," in violation of the Establishment Clause, the Supreme Court disagreed. *Id.* at 1818.

The Supreme Court explained that *Marsh* instructed that the constitutionality of a legislative prayer practice must be considered in light of "historical practices and understandings." *Id.* at 1819; *accord id.* at 1818–19. A practice is constitutional so long as it "fits within the tradition long followed in Congress and the state legislatures" because "[a]ny test [we] adopt[ for analyzing invocations] must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Id.*

The Court rejected the plaintiffs' argument that legislative prayer must be to a generic god or otherwise nonsectarian to pass muster under the Establishment Clause by focusing on three principles: the Framer's understanding of legislative prayer, the historical place legislative prayer occupies in society, and avoiding official government entanglement in crafting the content of prayers. In addition, the Court recognized that legislative prayer historically served a ceremonial function "at the opening of legislative sessions, where it is meant to lend gravity to the occasion and reflect values long part of the Nation's heritage." *Id.* at 1823. Observing first that legislative invocations containing explicitly religious themes were accepted at the time of the First Congress and remained vibrant throughout American history to modern times, the Court concluded, "[a]n insistence on nonsectarian or ecumenical prayer as a single, fixed standard is not consistent with [our accepted] tradition of legislative prayer." *Id.* at 1820. On this point,

71

the Court specifically disavowed *Allegheny*'s "nonsectarian" interpretation of *Marsh* as dictum "that was disputed when written and has been repudiated by later cases." *Id.* at 1821; *see also id.* ("*Marsh* nowhere suggested that the constitutionality of legislative prayer turns on the neutrality of its content.").

The Court further observed that a content-based rule "would force the legislatures that sponsor prayers and the courts that are asked to decide these cases to act as supervisors and censors of religious speech." *Id.* at 1822. Enforcing specific content restrictions would "involve government in religious matters to a far greater degree than is the case under the town's current practice of neither editing or approving prayers in advance nor criticizing their content after the fact." *Id.* "Once it invites prayer into the public sphere," the Court stated, "government must permit a prayer giver to address his or her own God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian." *Id.* at 1822–23.

Synthesizing these factors, the Court fashioned three distinct, but related, holdings. First, the Court held that the years of prayers offered on behalf of the Town of Greece, although almost exclusively Christian, did not evince a pattern of denigration (of non-Christian faiths) or proselytization (to bolster Christianity). Although some prayers arguably contained proselytizing or disparaging content, the Court concluded that the practice as a whole served only to solemnize the board meetings. In other words, a few questionable prayers were of no constitutional consequence. *Id.* at 1824.

Second, the Court determined to be of no moment the fact that the invited prayer givers were predominantly Christian: "[s]o long as the town maintains a policy of

72

nondiscrimination, the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing." *Id.* Continuing, the Court observed

> [t]he quest to promote a diversity of religious views would require the town to make wholly inappropriate judgments about the number of religions it should sponsor and the relative frequency with which it should sponsor each, a form of government entanglement with religion that is far more troublesome than the current approach.

*Id.*

Third, the Court rebuffed the plaintiffs' contention that the prayers unconstitutionally "coerce[] participation by nonadherents." *Id.* (Kennedy, J., plurality opinion). The Court acknowledged that "coercion" could render legislative prayer beyond constitutional protection in some outlying circumstances, such as "[i]f the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion." *Id.* at 1823 (majority opinion). And although Justices in the majority differed in their approaches, the Court nonetheless rejected the plaintiffs' argument that coercion arose from either the context of a local municipal government meeting, or the prayer givers' invitation that others could stand or join in the prayer. *Compare id.* at 1824–28 (Sec. II.B of Justice Kennedy's plurality opinion), *with id.* at 1837–38 (Sec. II of Justice Thomas's concurring opinion).

Justice Kennedy, joined by Chief Justice Roberts and Justice Alito, framed the coercion inquiry as "a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed." *Id.* at 1825 (plurality opinion). These Justices found no coercion in Greece's prayer practice, relying heavily on the

historical approach of *Marsh*. They presumed that reasonable observers are aware of the multiple traditions acknowledging God in this country, including legislative prayer, the Pledge of Allegiance, and presidential prayers. They concluded that, because of these traditions, citizens could appreciate the Town's prayer practice without being compelled to participate. *Id.* Further, they observed that the prayers served a non-religious purpose: putting legislators in a contemplative state of mind and connecting them to the historical tradition of their forerunners. *Id.* at 1826. Justice Kennedy made clear that "[o]ffense . . . does not equate to coercion." *Id.* He observed that "[a]dults often encounter speech they find disagreeable," even in a legislative forum, but that does not give rise to an Establishment Clause violation. *Id.* Instead, the historical acceptance of legislative prayer recognizes that "citizens, firm in their own beliefs, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith." *Id.* at 1823 (majority opinion).

Justice Thomas, joined by Justice Scalia, interpreted the Establishment Clause to prohibit only "actual legal coercion," which they defined as the exercise of "government power in order to exact financial support of the church, compel religious observance, or control religious doctrine." *Id.* at 1837 (Thomas, J., concurring in part and concurring in the judgment). As no evidence of actual legal coercion existed in this case, they concurred in the Court's judgment. *Id.* at 1837–38.

As this review of *Marsh* and *Town of Greece* confirms, our nation's long historical tradition of welcoming and encouraging legislative prayer gives the practice a unique place in Establishment Clause jurisprudence. It requires a different legal analysis than

74

other types of government conduct touching on religion.  The majority muddies the distinct analysis required in this type of Establishment Clause case, relying on more general principles applicable in other Establishment Clause contexts to avoid the clear legal principles set out in *Marsh* and *Town of Greece*.[4]  While lower court judges may personally disagree with the principles the Supreme Court pronounces, they are not at liberty to ignore or dilute them.  *DIRECTV, Inc. v. Imburgia*, 577 U.S. __, 136 S. Ct. 463, 468 (2015) (reiterating that although "[l]ower court judges are certainly free to note their disagreement with a decision of this Court," they are nonetheless bound to follow those decisions); *United States v. Taylor*, 754 F.3d 217, 223 (4th Cir. 2014) (Wilkinson, J.) ("[W]e shall follow the plain lessons of Supreme Court cases . . . , which must of necessity govern our disposition of this case.").

III.

The majority points to "the combination of [four] elements" that render the Board's prayer practice unconstitutional: (1) "commissioners as the sole prayer-givers"; (2) "invocations that drew exclusively on Christianity and sometimes served to advance that faith"; (3) "invitations to attendees to participate"; and (4) "the local government

---

[4] For example, the majority relies on *Engel v. Vitale*, 370 U.S. 421 (1962) (striking down structured prayers in public schools), for several general principles regarding why government should not become too affiliated with any religion.  Majority Op. 33.  These principles are valid insofar as they go.  But taken at face value, they would also lead to the conclusion that sectarian legislative prayers violate the Establishment Clause.  *See McCreary Cty. v. ACLU*, 545 U.S. 844, 859 n.10 (2005) (citing *Marsh* as an example of a permissible governmental action whose "manifest purpose was presumably religious").  Because *Marsh* and *Town of Greece* demand otherwise, their principles in this particular context must govern instead.

setting." Majority Op. 22–23. But a proper application of the principles of *Marsh* and *Town of Greece* to the Board's prayer practices leads to the opposite conclusion. Indeed, the Supreme Court has already addressed three of the four factors the majority relies on, and has explained why they do not serve as a basis for an Establishment Clause violation. The only new feature in this case is the identity of the prayer giver. But—for the reasons explained below—that single characteristic does not remove the Board's practice from the protected scope of *Marsh* and *Town of Greece*. In short, the majority wrongly concludes that the sum of the parts is greater than the whole—that is, that the four factors they present, which standing alone are undoubtedly constitutional, somehow combine to render the Board's legislative prayer practice unconstitutional.

Curiously, the majority accuses the dissents of lacking "any sense of balance." Majority Op. 18. Even more curiously, it suggests we fail to "consider the prayer practice. . . holistically." Majority Op. 39. However, the majority's invocation of balancing factors and viewing otherwise valid principles "holistically" in order to reach a preferred result is no camouflage for its lack of merit. In short, the majority misapplies *Town of Greece*'s assessment of how the factors are to be evaluated both individually and in tandem.

As we've set out at great length, the only factor that distinguishes this case from *Marsh* or *Town of Greece* is that, here, an individual commissioner gives a prayer on a rotating basis. We conclude that factor does not skew the totality of the circumstances to make Rowan County's practice unconstitutional. We then recount why the remaining aspects of the County's practice align with the practices previously approved of—in the

76

aggregate—in *Marsh* and *Town of Greece*. That is precisely the sort of analysis *Marsh* and *Town of Greece* require.

A.

*Town of Greece* instructs that the constitutionality of legislative prayer hinges on its historical roots. Because legislative prayer has been a constant and recognized part of civic life for more than two centuries, it "has become part of the fabric of our society." *Town of Greece*, 134 S. Ct. at 1819. Hence, if a prayer practice has long been "followed in Congress and the state legislatures," courts must view it as "a tolerable acknowledgement of beliefs widely held" by people in the United States. *Id.* at 1818–19; *see also id.* at 1819 (observing that prayer practices "accepted by the Framers and [which have] withstood the critical scrutiny of time and political change" must not be "swe[pt] away" because doing so "would create new controversy and begin anew the very divisions along religious lines that the Establishment Clause seeks to prevent").

The majority gives this principle only a curt nod before decrying the Board's practice of lawmaker-led legislative prayer as "unprecedented." Majority Op. 15. That conclusion cannot withstand review.

1.

Straightaway—and without any legal support for doing so—the majority attaches near-dispositive meaning to the fact that lawmakers, as opposed to clergy, gave the legislative prayers at issue in this case. While both *Marsh* and *Town of Greece* considered prayers given by clergy, the distinction between state-selected clergy prayer, on the one hand, and lawmaker-led prayer, on the other, is a distinction without a

77

difference. Neither *Marsh* nor *Town of Greece* attached particular significance to the identity of the speakers. Moreover, the tradition and history of lawmaker-led prayers is as prevalent as that of other legislative prayer givers. Thus, contrary to the majority's suggestion, the fact that the Supreme Court has not specifically addressed lawmaker-led prayer signifies nothing. Could it simply be that until recently, no one since 1788 had conceived that legislators leading legislative prayers for legislators was outside the historical tradition "followed in Congress and the state legislatures"? *Town of Greece*, 134 S. Ct. at 1819. *Contra* Majority Op. 17 ("The conspicuous absence of case law on lawmaker-led prayer is likely no accident.").[5]

The Supreme Court's analysis of legislative prayer in *Marsh* and *Town of Greece* did not look to the speakers' identities; instead, the Court confined its discussion to the circumstances of the prayer practices before it. *See Town of Greece*, 134 S. Ct. at 1820–28; *Marsh*, 463 U.S. at 786–95. Nowhere did the Court say anything that could reasonably be construed as a requirement that outside or retained clergy are the only constitutional source of legislative prayer. Quite the opposite, *Town of Greece* specifically directs courts' focus to what has been done in "Congress and the state legislatures" without limitation regarding the officiant. 134 S. Ct. at 1819. Far from suggesting that this case falls outside the scope of *Marsh* or *Town of Greece*, the Supreme

---

[5] Neither *Marsh* nor *Town of Greece* specifically put into issue lawmaker-led legislative prayers as their focus was the issue of legislative prayer as a whole. That said, the record in *Town of Greece* shows that on at least one occasion a councilman offered a prayer during the ceremonial opening. *See* Joint Appendix, *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014) (No. 12–696), 2013 U.S. S. Ct. Briefs LEXIS 3132, at *62–63.

Court's silence on the issue of lawmaker-led prayer is simply that: silence. *See United States v. Stewart*, 650 F.2d 178, 180 (9th Cir. 1981) (remarking it would be improper to draw any inference from the Supreme Court's silence on an issue not placed before it).

Nor has this Court previously assigned weight to the identity of the prayer giver. To the contrary, we have suggested that the speaker's identity is irrelevant. For example, in *Wynne v. Town of Great Falls*, 376 F.3d 292 (4th Cir. 2004), we remarked that "[p]ublic officials' brief invocations of the Almighty before engaging in public business have always, as the *Marsh* Court so carefully explained, been part of our Nation's history." *Id.* at 302. Similarly, *Joyner v. Forsyth County*, 653 F.3d 341 (4th Cir. 2011), observed that "[i]t [is] the governmental setting for the delivery of sectarian prayers that courted constitutional difficulty, not those who actually gave the invocation." *Id.* at 350; *see also id.* at 351 ("Once again, the important factor was the nonsectarian nature of the prayer, not the identity of the particular speaker."). And in *Simpson v. Chesterfield County Board of Supervisors*, 404 F.3d 276 (4th Cir. 2005), we noted that the Supreme Court, "neither in *Marsh* nor in *Allegheny*, held that the identity of the prayer-giver, rather than the content of the prayer, was what would affiliate the government with any one specific faith or belief." *Id.* at 286. Although these cases ultimately turned on the now-rejected position that sectarian prayer was constitutionally invalid, none made the prayer giver's identity a factor in, let alone dispositive of, its analysis.

That conclusion makes sense given that legislative prayer constitutes a form of government speech regardless of the identity of the speaker; otherwise, it would not implicate the Establishment Clause at all. *See, e.g.*, *Snyder v. Murray City Corp.*, 159

79

F.3d 1227, 1238 (10th Cir. 1998) (Lucero, J., concurring in the judgment) (recognizing that "chaplains speak for the legislature"). Practically speaking, the public is unlikely to draw any meaningful distinction between a state-paid chaplain (*Marsh*) or state-invited cleric (*Town of Greece*) and members of the legislative body that appoints him. These invited officiants are in essence "deputized" to speak on behalf of the governing body. *Cf. Town of Greece*, 134 S. Ct. at 1850 (Kagan, J., dissenting). Yet the practice was constitutional, even when those officiants aligned with a particular religion and were paid with state funds. Because a paid or invited officiant stands on the same footing as the legislators, it follows that elected representatives may also be their own prayer givers. And when they take on that role, their religious preference in the ceremonial invocation is no different than the state-sponsored clergy in *Marsh* and *Town of Greece*. The Supreme Court directly observed in *Town of Greece* that a purpose of legislative prayer was to allow legislators to "show who and what they are" through their prayers. *Id.* at 1826 (plurality opinion). It thus makes abundant common and constitutional sense that legislators are ideally suited to offer meaningful, heartfelt prayer to the audience of those prayers: their fellow legislators. *Id.* at 1825.

On a broader level, the very "history and tradition" anchoring *Town of Greece* underscores a long-standing national practice of legislative prayer generally and lawmaker-led prayer specifically. Opening invocations offered by elected legislators have long been accepted as both a mainstay of civic life and a permissible form of religious observance. *See* S. Rep. No. 32-376, at 4 (1853) (commenting that the authors of the Establishment Clause "did not intend to prohibit a just expression of religious

80

devotion *by the legislators of the nation, even in their public character as legislators*" (emphasis added)); *see also Lynch*, 465 U.S. at 674 ("There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789."). As just one example, the South Carolina Provincial Congress—South Carolina's first independent legislature—routinely welcomed an elected member to deliver invocations. *See, e.g.*, South Carolina Provincial Congress, Thanks to the Continental Congress (Jan. 11, 1775), http://amarch.lib.niu.edu/islandora /object/niu-amarch%3A94077 (last visited May 23, 2017) (saved as ECF opinion attachment). These early public pronouncements are important evidence demonstrating that lawmaker-led legislative prayer was viewed no differently from legislative prayer as a whole. To conclude otherwise is to impugn the practical wisdom of the Framers—a factor that weighed heavily in *Town of Greece*—and to suggest "the founders of the United States were unable to understand their own handiwork." *Myers v. Loudoun Cty. Pub. Sch.*, 418 F.3d 395, 404 (4th Cir. 2005).

Equally troubling, the majority turns a blind eye to the prevalence of lawmaker-led legislative prayer. A majority of states and territories honor requests from individual legislators to give an opening invocation. *See* Nat'l Conference of State Legislatures, *Inside the Legislative Process* 5–151 to –152 (2002), http://www.ncsl.org/documents /legismgt/ILP/02Tab5Pt7.pdf (observing legislators may offer an opening prayer in at least thirty-one states). Lawmaker-led prayer is especially prevalent in the states under our jurisdiction, where seven of the ten legislative chambers utilize elected members for this purpose. *See id.*; Br. of Amici Curiae State of West Virginia et al. Supporting Def.-

81

Appellant at 14 & Add. 2–8; *see also* Office of Speaker Pro Tem Paul Stam, *Prayers Offered in the North Carolina House of Representatives: 2011–2014*, http://nchousespeaker.com/docs/opening-prayers-nchouse-2011-2014.pdf (last visited May 23, 2017). Several of these states have enacted legislation recognizing and protecting the historical practice of lawmaker-led prayer. For example, a Virginia statute protects legislators who deliver a sectarian prayer during deliberative sessions. *See* Va. Code Ann. § 15.2-1416.1. And South Carolina expressly authorizes its elected officials to open meetings with prayer. *See* S.C. Code Ann. § 6-1-160(B)(1). Other states inside and outside our jurisdiction rely exclusively on lawmaker-led prayers. *See, e.g.*, Mich. H.R. Rule 16 (requiring the clerk of the Michigan House of Representatives to "arrange for a Member to offer an invocation" at the beginning of each session); Nat'l Conference of State Legislatures, *supra*, at 5-152 (the Rhode Island Senate); Kate Havard, *In delegates they trust: Md. House members lead secular prayer*, Wash. Post (Mar. 9, 2013), https://www.washingtonpost.com/local/md-politics/in-delegates-they-trust-md-house-members-lead-secular-prayer/2013/03/09/571fef8e-810a-11e2-8074-b26a871b165a_story.html.

Lawmaker-led prayer finds contemporary validation in the federal government as well. Both houses of Congress allow members to deliver an opening invocation. The congressional record is replete with examples of legislators commencing legislative business with a prayer. *See, e.g.*, 161 Cong. Rec. S3313 (daily ed. May 23, 2015) (prayer by Sen. James Lankford); 159 Cong. Rec. S3915 (daily ed. June 4, 2013) (prayer by Sen. William M. Cowan); 155 Cong. Rec. S13401 (daily ed. Dec. 18, 2009) (prayer by Sen.

82

John Barrasso); 119 Cong. Rec. 17,441 (1973) (prayer by Rep. William H. Hudnut III); *see also* 2 Robert C. Byrd, *The Senate 1789-1989: Addresses on the History of the United States Senate* 305 (Wendy Wolff ed., 1990) ("Senators have, from time to time, delivered the prayer.").

Particularly relevant to this case, lawmaker-led prayers frequently accompany the opening of local governmental meetings. *See, e.g.*, Br. of Amici Curiae State of West Virginia et al. Supporting Def.-Appellant at 24–26 & Add. 11–43. In many localities, those prayers are exclusively lawmaker-led. *See id.*; *see also* Suppl. Br. of Amici Curiae State of West Virginia et al. Supporting Def.-Appellant Seeking Reversal at 9–10 & A10–A54.

In view of this long and varied tradition of lawmaker-led prayer, any wall barring elected legislators from religious invocations runs headlong into the Supreme Court's acknowledgement that "[a]ny test [we] adopt[] must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Town of Greece*, 134 S. Ct. at 1819. As Justice Alito aptly explained, "if there is any inconsistency between any [Establishment Clause] test[] and the historic practice of legislative prayer, the inconsistency calls into question the validity of the test, not the historic practice." *Id.* at 1834 (Alito, J., concurring). The majority's conclusion strikes down a legislative prayer practice that is "part of the fabric of our society." *Id.* at 1819 (majority opinion).

2.

The majority couples its angst about the identity of the prayer giver in this case with "legislators [being] the *only* eligible prayer-givers." Majority Op. 17. That again is a fact without constitutional significance. The fact that the overwhelming majority of the prayers represented the Christian faith stems not from any "aversion or bias on the part of town leaders against minority faiths," *Town of Greece*, 134 S. Ct. at 1824, but from the composition of the Board. *Town of Greece* made clear that the Constitution does not require the government actively court religious balance "[s]o long as the town maintains a policy of nondiscrimination." *Id.*; *see also Pelphrey v. Cobb Cty.*, 547 F.3d 1263, 1281 (11th Cir. 2008) ("[*Marsh*] does not require that all faiths be allowed the opportunity to pray. The standard instead prohibits purposeful discrimination.").

There is no indicia of discrimination in this record. None. Nor is there any suggestion that the Board has or would bar any commissioner from offering a prayer faithful to the commissioner's own traditions, regardless of his or her faith. Without such evidence, we cannot conclude that the Board's prayer practice unconstitutionally limits the universe of prayer givers in violation of the Establishment Clause.

The majority implicitly acknowledges the lack of evidence in the record on this point, and so instead faults the Board's "rigid, restrictive" prayer practice as contrasted with the "flexible, inclusive approach upheld in *Town of Greece*." Majority Op. 24. That widely misses the point.

*Marsh* and *Town of Greece* were both acceptable legislative prayer practices, but neither imposed a fixed standard for the nature or number of prayer givers that would be

84

constitutional. Just because the Supreme Court has upheld a more "flexible, inclusive" approach" does not mean that other, more structured approaches are thereby unconstitutional. If anything, the prayer practice here is far more "inclusive" and multi-faceted than the one the Supreme Court approved in *Marsh*, with only one prayer giver from one faith tradition. *See infra* Sec. II. Moreover, while *Town of Greece*'s practice resulted in a larger population of prayer givers, the majority elevates diversity to be the *sine qua non* of constitutionality. *See* Majority Op. 23–25 (citing the need for a constitutional practice to "embrac[e] religious pluralism and the possibility of a correspondingly diverse invocation practice," and considering whether a particular prayer practice could be more welcoming or do more to "cultivate[] an atmosphere of greater tolerance and inclusion"); *see also* Majority Op. 32 (expounding that "legislative prayer gives voice to the ecumenical dimensions of religious faith"). But *Marsh* and *Town of Greece* do not require enforced ecumenicalism nor do they demand denominational diversity; indeed, the Supreme Court expressly distanced itself from such a requirement. *E.g.*, *Town of Greece*, 134 S. Ct. at 1824 (rejecting the view that lawmaking bodies must "promote a diversity of religious views"). Instead, the Court focused on whether the legislature's practice—whatever that practice might be—evinces an unlawful discriminatory motive. Here, the record reflects none.

In short, the Supreme Court's prohibition on discrimination in this context is aimed at barring government practices that result from a deliberate choice to favor one religious view to the exclusion of others. As explained in *Town of Greece*, concerns arise only if there is evidence of "an aversion or bias on the part of town leaders against

85

minority faiths" in choosing the prayer giver. *Id.* The *Marsh* Court likewise alluded to this requirement when it cautioned that the selection of a guest chaplain cannot stem from "an impermissible motive." 463 U.S. at 793. This parameter is directed at the conscious selection of the prayer giver on account of religious affiliation or conscious discrimination against a prayer giver due to a religious affiliation. *See id.* Because there's no evidence of either in this record, the limited-universe of prayer givers does not violate the principles espoused in *Marsh* and *Town of Greece*.

In another misreading of Supreme Court precedent, the majority contorts *Marsh* to foster its novel rule mandating a broad universe of eligible prayer givers. A contextual review of *Marsh* leads to the opposite conclusion: the Nebraska legislature paid the same Presbyterian minister to offer prayers for sixteen years. 463 U.S. at 785, 793. In rejecting the argument that this closed universe of prayer givers created a constitutional concern, the Supreme Court observed, "[a]bsent proof that the chaplain's reappointment stemmed from an impermissible motive, we conclude that his long tenure does not in itself conflict with the Establishment Clause." *Id.* at 793–94. While it is true that other individuals occasionally substituted for the Nebraska chaplain, the fact remained that the overwhelming majority of prayers during that sixteen-year period were given by a single state-paid prayer giver from a single faith tradition. Even so—and entirely consistent with the Court's later statements in *Town of Greece*—that fact did not give rise to a constitutional concern because there was, as here, no evidence of an impermissible motive. 134 S. Ct. at 1824. *Marsh*'s facts and holding stand for the principle that the selection of a single legislative prayer giver, or a limited set of prayer givers, who

represent a single religious tradition does not advance any one faith or belief over another. *See* 463 U.S. at 793 ("We cannot, any more than Members of the Congresses of this century, perceive any suggestion that choosing a clergyman of one denomination advances the beliefs of a particular church."); *Ctr. for Inquiry, Inc. v. Marion Circuit Court Clerk*, 758 F.3d 869, 874 (7th Cir. 2014) ("*Marsh* and *Greece* show that a government may, consistent with the First Amendment, open legislative sessions with Christian prayers while not inviting leaders of other religions[.]").

A fortiori, *Town of Greece* does not support the majority's expansive view. Not only are the legislators themselves the intended "congregation" for legislative prayer, *Town of Greece*, 134 S. Ct. at 1825 (plurality opinion), but the Supreme Court has recognized that legislative prayer practices carry special meaning to the thousands of local and state "citizen representatives" throughout this country. In fact, the Supreme Court in *Town of Greece* specifically acknowledged "members of town boards and commissions, who often serve part-time and as volunteers," were lawmakers for whom "ceremonial prayer may . . . reflect the values they hold as private citizens." *Id.* at 1826. To repeat an earlier observation, if legislative prayer particularly reflects the values of "citizen representatives," then it stands to reason that these "citizen representatives" should be able to lead prayers in a way that connects with their intended audience: themselves. *Id.* Legislators are uniquely qualified to offer uplifting, heartfelt prayer on matters that concern themselves and their colleagues.

These precepts also demonstrate why lawmaker-led prayer does not, as the majority misconstrues, violate the principle that governments not be in the business of

87

"compos[ing] official prayers." *Compare* Majority Op. 23 (quoting *Lee v. Weisman*, 505 U.S. 577, 588 (1992)), *with Town of Greece*, 134 S. Ct. at 1822 (observing that requiring prayers to be nonsectarian "would involve *government* in religious matters to a far greater degree than is the case under the town's current practice of neither editing or approving prayers in advance nor criticizing their content after the fact" (emphasis added)).

Here, the Board's practice does not venture into impermissible writing or editing of religious speech. Rather, each commissioner gives his or her own prayer without oversight, input, or direction from the Board, which does not supervise or censor the speech of its individual commissioners in crafting the prayers. Indeed, there is no evidence that the Board, as a Board, had any role in any of the prayers given by any of the individual commissioners. The record is devoid of any suggestion that any prayer in this case is anything but a personal creation of each commissioner acting in accord with his or her personal views. As a consequence, each commissioner is essentially a free agent no different from the ministers in *Town of Greece* or the paid chaplain in *Marsh*, who gave invocations of their own choosing. Contrary to the majority's conclusion, the Board's practice does not present the same concerns as when the "*government* [attempts] to define permissible categories of religious speech." *Town of Greece*, 134 S. Ct. at 1822 (emphasis added). Instead, the Board's legislative prayer practice amounts to nothing more than an individual commissioner leading a prayer of his or her own choosing.

For all these reasons, the majority errs in concluding that commissioners delivering the ceremonial prayer to open a Board meeting is a relevant distinguishing feature for the constitutional analysis set out *Marsh* and *Town of Greece*.[6]

B.

As the identity of the legislative prayer givers at issue has no cognizable constitutional significance in this case, I turn next to the remaining characteristics of the Board's prayer practice discussed by the majority: content, coercion, and local government setting. Although the Supreme Court has not forged a comprehensive template for all acceptable legislative prayer, its decisions set out guideposts for analyzing whether a particular practice goes beyond constitutional bounds. *See Snyder*, 159 F.3d at 1233 ("*Marsh* implicitly acknowledges some constitutional limits on the scope and selection of legislative prayers[.]").

1.

As the majority points out, one of the guideposts to acceptable legislative prayers is the content of those prayers. After reaffirming the holding in *Marsh* that lower courts should refrain from becoming embroiled in review of the substance of legislative prayer,

---

[6] The majority also conjures up the "risk of political division" arising from alleged conflicts concerning the Board's prayer practice. Majority Op. 26. But neither audience-initiated criticism of those who object to a prayer practice nor election-oriented policy statements by Board candidates are relevant to the issue of law before the Court. Questions concerning the wisdom of the practice of legislative prayer can be rightly debated in many squares, but the judiciary is not one of them. The Court's task is solely to decide whether the Board's practice is lawful under the First Amendment, not whether it is popular or wise.

*Town of Greece* noted that there could be certain sectarian actions that might cause a legislative prayer practice to fall outside constitutional protection, such as "[i]f the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion." 134 S. Ct. at 1823. In that circumstance, the Court observed, "many present may consider the prayer to fall short of the desire to elevate the purpose of the occasion and to unite lawmakers in their common effort." *Id.*

To this end, courts need only assure themselves that sectarian legislative prayer, viewed from a cumulative perspective, is not being exploited to, inter alia, proselytize or disparage. Less egregious conduct warrants no further review. Indeed, the Supreme Court has disclaimed any interest in the content of legislative invocations, announcing a strong disinclination "to embark on a sensitive evaluation or to parse the content of a particular prayer." *Marsh*, 463 U.S. at 795. The record in this case demonstrates that the Board's prayer practice did not stray across the constitutional line of advancement, proselytization, or disparagement. In fact, the prayers here are much further from that line than those before the Supreme Court in *Marsh* and *Town of Greece*.

To reach the opposite conclusion, the majority selectively quotes a handful from the hundreds of prayers offered in Board meetings to demonstrate what it perceives to be impermissible "promotion" of Christianity. *E.g.*, Majority Op. 28–32. But in so doing, the majority untethers *Town of Greece*'s broader analysis from the specific prayers at issue in that case which the Supreme Court necessarily found did not cross any constitutional line. Even a cursory comparison shows that the prayers highlighted by the

90

majority have less questionable language than that contained in the prayers upheld in *Marsh* and *Town of Greece*.

The content of the commissioners' prayers largely encompassed universal themes, such as giving thanks and requesting divine guidance in deliberations, much in line with the prayers challenged in *Town of Greece*. *Cf. Town of Greece*, 134 S. Ct. at 1824 (noting the prayers "invoked universal themes, as by celebrating the changing of the seasons or calling for a 'spirit of cooperation' among town leaders"). References to exclusively Christian concepts typically consisted of the opening or closing line, such as "In Jesus' name. Amen," exactly as in most prayers in *Town of Greece*. *Compare* Suppl. J.A. 29–31, *with Town of Greece*, 134 S. Ct. at 1824 (noting a "number of the prayers did invoke the name of Jesus, the Heavenly Father, or the Holy Spirit").

The invocation delivered at the Board's October 17, 2011, meeting illustrates what Board members and the public would typically hear:

> Let us pray. Father we do thank you for the privilege of being here tonight. We thank you for the beautiful day you've given us, for health and strength, for all the things we take for granted. Lord, as we read in the paper today, the economic times are not good, and many people are suffering and doing without. We pray for them; we pray that you would help us to help. We pray for the decisions that we will make tonight, that God, they would honor and glorify you. We pray that you would give us wisdom and understanding. We'll thank you for it. In Jesus' name. Amen.

Suppl. J.A. 31.

Some of the commissioners' prayers contained more direct references to Christian teachings, but so did the prayers in *Town of Greece*. *E.g.*, Majority Op. 28–32 (quoting prayers from the record). For example, the following prayers in *Town of Greece* gave the

91

Supreme Court no pause, but would be anathema and forbidden under the majority's reasoning:

- "Let us pray. . . . Lord this evening we ask you especially to bless [the new fire marshal and police captain]. Fill their hearts Lord with zeal to serve your people, and Lord we ask you to bless us all, that everything we do here tonight will move you to welcome us one day into your kingdom as good and faithful servants. We ask this in the name of our brother Jesus. Amen." Joint Appendix, *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014) (No. 12–696), 2013 U.S. S. Ct. Briefs LEXIS 3132, at *34.

- "[W]e acknowledge the role of the Holy Spirit in our lives and that while there is a variety of gifts, there is always the one and the same spirit working in different ways in different people. . . . We pray this evening for the guidance of the Holy Spirit as the Greece Town Board meets. . . . Praise and glory be Yours oh Lord. Now and forever. Amen. Let's just say the Our Father together. Our Father who art in Heaven, hallowed by [sic] thy name, thy kingdom come, thy will be done, on Earth as it is in Heaven, give us this day, our daily bread, forgive us our trespasses, as we forgive those who trespass against us, and lead us not into temptation, but deliver us from evil for thine is the kingdom, and the power, and the glory forever and ever." Amen." *Id.* at *49.

- "Would you bow your heads with me as we invite the Lord's presence here tonight? Gracious Lord, we thank you so much for this opportunity to come together, to plan, to build, to establish direction for this fine community. And Lord, we acknowledge tonight that without your help, without your grace, without your wisdom, we'd probably make a mess of things. . . . Direct, guide, lead and establish your will." *Id.* at *66.

- "Join me in prayer, if you would please. . . . My sister doesn't get to live in a town where there's a supervisor and councilmen that are God-fearing people. . . . Lord, may we not take the freedoms, the privileges, the opportunity that we have for granted. . . . I pray, Father, that they might remember to look to your word for wisdom and direction. And Father that you would help us to keep you first and foremost in our lives and in our minds. We thank you for what you have done. In Christ's name I pray. Amen." *Id.* at *78–79.

- "Our Father, we know that you are sovereign over all creation. You are sovereign over this world. You are sovereign over this town. And Lord, you have placed these men and women as your servants to serve you first of

92

all and then to serve this town and the people that live in this town, and so I pray that for them, they would have the attributes of godly leaders that would serve well. . . . Lord help them to stand up for those things that this town would be blessed because of godly leadership, of leadership that does right, that this town would flourish because it reflects the kingdom of God where things are done in order. And so I bring them before you. I pray that the proceedings tonight and through this year would reflect who you are and how you are leading, for I pray it in the name of your son Jesus Christ. Amen." *Id.* at *89–90.

- "Let us pray. Lord, God of all creation, we give you thanks and praise for your presence and action in the world. We look with anticipation to the celebration of Holy Week and Easter. It is in the solemn events of next week that we find the very heart and center of our Christian faith. We acknowledge the saving sacrifice of Jesus Christ on the cross. We draw strength, vitality, and confidence from his resurrection at Easter. Jesus Christ, who took away the sins of the world, destroyed our death, through his dying and in his rising, he has restored our life. Blessed are you, who has raised up the Lord Jesus, you who will raise us, in our turn, and put us by His side." *Id.* at *91.

- "Let's pray. Father, we acknowledge that all authority and power resides [sic] in you. So as we come before you this evening, I pray for the men and women who sit behind me. I pray that they would acknowledge that you are the supreme ruler of all and that any authority they have, any rulership they have, is granted to them by you, by your sovereign will." *Id.* at *92–93.

- "Lord, you are a mighty and awesome God, the ruler of the nations, the king of the earth, and all authority, whether wielded in state, or in home, or in church, is derived from you as a stewardship. . . . You are also a wise God, oh Lord, as seen in the world around us, and as evidenced even in the plan of redemption that is fulfilled in Jesus Christ. . . . We ask these things in the name of the Lord and Savior Jesus Christ, who lives with you and the Holy Spirit, one God for ever and ever. Amen." *Id.* at *104–05.

- "Lord God of all creation, we give you thanks and praise for your presence and action in the world. We are approaching the end of the Easter Season [indiscernible] Easter, the ascension of the Lord on Thursday, this week, coming at the end of the forty days of Jesus Christ's resurrection appearances, and with the Feast of Pentecost ten days later, on Sunday, May the 31st. The beauties of spring—the flowers, the blossoms, the fresh green on the trees, and the warmer weather—are an expressive symbol of

the new life of the risen Christ.  The Holy Spirit was sent to the apostles at Pentecost so that they would be courageous witnesses of the Good News to different regions of the Mediterranean world and beyond. The Holy Spirit continues to be the inspiration and the source of strength and virtue, which we all need in the world of today. . . . We pray this evening for the guidance of the Holy Spirit as the Greece Town Board meets." *Id.* at *148–50.

The prayers in *Marsh* invoked similarly pointed Christian themes, none of which caused any constitutional question in the Supreme Court's view.  For example, one prayer contained the following language:

> Father in heaven, the suffering and death of your son brought life to the whole world moving our hearts to praise your glory.  The power of the cross reveals your concern for the world and the wonder of Christ crucified.
> The days of his life-giving death and glorious resurrection are approaching.  This is the hour when he triumphed over Satan's pride; the time when we celebrate the great event of our redemption.
> We are reminded of the price he paid when we pray with the Psalmist[,]

at which point the chaplain quoted from Psalm 22.  *Marsh*, 463 U.S. at 823 n.2 (Stevens, J., dissenting).  And in a prayer offered before Easter one year, the Nebraska chaplain prayed, "Today as we are about to celebrate the great Holy Days of Christians and Jews, Holy Week and Passover, let us be reminded again through the faith and beliefs of our religions of the principles and directives which should guide us. . . . May these Holy Days, then, enable us to act as true followers of the beliefs which we have and may it find expression in every act and law that is passed."  Joint Appendix at 108, *Marsh v. Chambers*, 463 U.S. 783 (1983) (No. 82–23), *quoted in Snyder*, 159 F.3d at 1234 n.11.

In short, the prayers actually offered in *Marsh* and *Town of Greece* contained the same sort of pleas to the Christian God and to Jesus Christ, the same recognition of a

94

Christian tenet of salvation and dependence on God's favor, and the same generalized exhortations to obedience to Christian teachings as those prayers singled out for concern by the majority. If the prayers in *Marsh* and *Town of Greece* did not independently merit concern as to content, then neither do the prayers offered in Rowan County.

Contrary to the majority's consternation, the prayers in the case at bar do not, taken together, reflect a pattern of proselytizing any more than those in *Town of Greece* or *Marsh.* The majority's examples merely reflect sectarian themes that hew to Christian doctrines. Other examples assume that the audience agrees with the prayer givers' words or *already* shares a Christian viewpoint. Proselytization, in contrast, "means to seek to 'convert' others to" "a particular religious belief," *Wynne*, 376 F.3d at 300, meaning that it seeks a change from one view to a different one. But the prayers by the commissioners never explicitly or implicitly ask the hearers to change beliefs, to adopt as true any principles of the Christian faith, or anything else traditionally understood to be words imploring conversion. In addition, none of the prayers here threaten damnation to those of different faiths, belittle or chastise dissenters, or denigrate any other religious viewpoints. *See, e.g.*, *Snyder*, 159 F.3d at 1235 (finding the plaintiff's proffered prayer unconstitutional because it "strongly disparage[d] other religious views" and "s[ought] to convert his audience").

Notably, although the majority concludes that the prayers "suggest[ed] that other faiths are inferior," it does not point to any language from the prayers maligning non-Christian beliefs. *See* Majority Op. 31. At most, it subjectively intuits the prayers "implicitly signaled disfavor toward non-Christians" whenever they "portray[ed] the

95

failure to love Jesus or follow his teachings as spiritual defects." Majority Op. 31. That conclusion contradicts *Town of Greece*'s direct instruction that legislative prayers can be sectarian, and thus espouse Christian or other faith teachings. Distilled, the majority holds that any time a legislative prayer contains sectarian language favoring one belief it implicitly signals disfavor toward sects that do not adhere to that belief. But that cannot be what *Town of Greece* meant by denigrating other faiths because it expressly held that sectarian prayers do not cross this line.

Stripped of these considerations, what remains are passing references in only some of the prayers at issue that—at worst—merely approach the line drawn in *Town of Greece*. Given their paucity against the entire record, however, the prayers in this case easily meet the test articulated in *Town of Greece*, which held that a few stray remarks are insufficient to "despoil a practice that on the whole reflects and embraces our tradition" of legislative prayers. 134 S. Ct. at 1824. Or, to use *Town of Greece*'s other admonition, even if certain phrases in a handful of prayers are questionable, the practice at issue as a whole does not show "a pattern of prayers that over time, denigrate, proselytize, or betray an impermissible government purpose," a legal condition precedent to any claim of a constitutional violation. *Id.*

Nor do the number of sectarian prayers and period of time at issue change the analysis. *Town of Greece*'s reference to a "pattern of prayers . . . over time" must be understood in the context of that case. The period at issue there was 1999 to 2010, which encompassed some 120 monthly meetings, and for all but the last three years in that record, the prayers were offered *solely* from a Christian tradition. Even during those

last three years, only four prayers were given from a non-Christian faith tradition. *Id.* at 1839 (Breyer, J., dissenting). If those circumstances did not constitute an impermissible pattern of prayers that advanced Christianity or otherwise crossed the line, neither do the facts of this case.

Here, the complaint challenged the Board's prayer practice from November 2007 through March 2013, a much shorter period of time than that covered in *Town of Greece*, though the meetings occurred twice a month rather than monthly. Suppl. J.A. 12–38. The majority notes that "97% of the Board's prayers mention[] 'Jesus,' 'Christ,' or the 'Savior.'" Majority Op. 6. Thus, in both *Town of Greece* and here, the prayers skewed heavily toward the Christian faith. Yet Greece's prayer practice was not the ecumenical utopia the majority paints in order to cast Rowan County's practice in a more negative light. Viewed against the facts of *Town of Greece*, the Board's practice crossed no constitutional line.

The same cannot be said of the majority's review of the Board's practice: by engaging in such detailed parsing of both the words of individual prayers and the percentages of sectarian versus non-sectarian prayers, the majority violates the Supreme Court's instruction that courts should not be the "supervisors and censors of religious speech." *Town of Greece*, 134 S. Ct. at 1822. In other words, "[o]nce it invites prayer into the public sphere, government must permit a prayer giver to address his or her own God or gods as conscience dictates, *unfettered by what an administrator or judge considers to be nonsectarian*." *Id.* at 1822–23 (emphasis added).

97

The majority appears to prefer the pre-*Town of Greece* principle that legislative prayers must consist of generic, nonsectarian prayers that appease the broadest audience while offending the least. *E.g.*, Majority Op. 29 ("[I]n considering whether government has aligned itself with a particular religion, a tapestry of many faiths lessens that risk whereas invoking only one exacerbates it."); Majority Op. 32 ("At its best, legislative prayer gives voice to the ecumenical dimensions of religious faith."); Majority Op. 38–39 ("The ultimate criterion is simply one of conveying a message of respect and welcome for persons of all beliefs and adopting a prayer practice that advances the core idea behind legislative prayer, that people of many faiths may be united in a community of tolerance and devotion."). The majority's trouble with the ceremonial legislative prayer here thus stems from its disagreement with the basic holding of *Town of Greece*. But that disagreement cannot alter our role, as we are bound to faithfully apply the law articulated by the Supreme Court. *ARA Servs., Inc. v. NLRB*, 71 F.3d 129, 138 (4th Cir. 1995) (Motz, J., concurring in part and dissenting in part) ("[D]isagreement provides no basis for refusing to follow a directive of the Supreme Court[.]"). That is judicial review run amok, particularly in a context where the Supreme Court has exhorted restraint.

One of the majority's recurring themes is that if Rowan County's legislative prayer practice is constitutional, there would be no limits to the constitutionality of legislative prayer. *E.g.*, Majority Op. 41–43. Not so. As the above analysis observes, the Board's practice adheres to the constitutional limits set out in *Marsh* and *Town of Greece*. This conclusion does not ignore the boundaries both cases set for practices that would cross a constitutional line. For example, prayers that implored the audience to

attend a particular church would violate *Town of Greece*'s admonition that a prayer practice should not, over time, proselytize. Prayers that exhorted the hearers to renounce their faith tradition would similarly transgress this line. So, too, one can easily understand *Town of Greece*'s concern that a legislative body could not, in fact, make official decisions based on whether a member of the public participated in, or voiced opposition to, the legislative prayer practice. Contrary to the majority's hyperbole, concluding that the prayer practice at issue in this case is constitutional does not leave *Town of Greece*'s boundaries meaningless; far from it.

2.

The majority also finds constitutionally significant that the legislative prayer at issue here occurs before local government meetings as opposed to state or federal legislatures. *See* Majority Op. 36–39. Rather than following *Town of Greece*'s instructive analysis, the majority instead muses about local government meetings as different than other legislative entities. For example, it notes that "[r]elative to sessions of Congress and state legislatures, the intimate setting of a municipal board meeting presents a heightened potential for coercion" because, inter alia, citizens routinely come directly before the board. Majority Op. 36. It also observes that the "Board exercises both legislative authority . . . [and] quasi-adjudicatory power." Majority Op. 36. And it fears "the intimacy of a town board meeting may push attendees to participate in the prayer practice in order to avoid the community's disapproval," or so "they would not stand out" just prior to the Board considering their petitions. Majority Op. 38. In so

doing, the majority draws on an argument posited by the petitioners in *Town of Greece* and firmly rejected by the Supreme Court.

> Specifically, in *Town of Greece* the petitioners asserted that
>
>> the intimate setting of a town board meeting differs in fundamental ways from the invocations delivered in Congress and state legislatures, where the public remains segregated from legislative activity and may not address the body except by occasional invitation. Citizens attend town meetings, on the other hand, to accept awards; speak on matters of local importance; and petition the board for action that may affect their economic interests, such as the granting of permits, business licenses, and zoning variances. . . . [T]he fact that board members in small towns know many of their constituents by name only increases the pressure to conform.

134 S. Ct. at 1824–25 (plurality opinion). In concluding none of these points affected the constitutionality of Greece's prayer practice, the Supreme Court plurality considered both the history and purpose of legislative prayer.

First, the plurality measured legislative prayer "against the backdrop of historical practice." *Id.* at 1825. As discussed above, lawmaker-led legislative prayer is part and parcel of the same historical roots as legislative prayer more broadly. *Infra* Sec. III.A.1. Similarly, prayers at local government meetings are as historically rooted as prayers at the state and federal levels. *Id.*; *see also infra* Sec. II (discussing *Town of Greece*).

Next, the plurality noted that "[t]he principal audience for these invocations is not, indeed, the public but lawmakers themselves." *Town of Greece*, 134 S. Ct. at 1825 (plurality opinion). In fact, the plurality found that legislative prayer has a particularly meaningful personal connection "[f]or members of town boards and commissions, who often serve part-time and as volunteers," precisely because it "reflect[s] the values they hold as private citizens. The prayer is an opportunity for them to show who and what

100

they are without denying the right to dissent by those who disagree." *Id.* at 1826. That the Supreme Court lauded the opportunity legislative prayer afforded *local* lawmakers to express their values highlights the majority's perplexing conclusion here that prayer practices at the local level are actually *more* suspect. For the majority, it's as if *Town of Greece* never happened.

Of course, this is not to say that legislative prayers cannot be coercive. But as the *Town of Greece* plurality recognized, "if town board members *directed* the public to participate in the prayers, *singled out* dissidents for opprobrium, or *indicated that their decisions might be influenced by* a person's acquiescence in the prayer opportunity," then coercion may exist. *Id.* (emphasis added). But the record here is devoid of those features.

For example, the record does not show that the Board ever ordered public participation in its prayer services. Instead, the record presents precisely the sort of procedure the Supreme Court approved in *Town of Greece*. There, "board members themselves stood, bowed their heads, or made the sign of the cross during the prayer, [but] they at no point solicited similar gestures by the public." *Id.* There's no evidence in the record before this Court that any of the commissioners ever commanded or demanded the public audience to rise or bow their heads, make the sign of the cross, or otherwise make any symbol of religious expression during the prayer. And while the Board extended the courtesy to those in attendance by inviting them to stand, there's no evidence that anyone was required to do so. Tellingly, the Plaintiffs' own evidence shows portions of the public audience simply chose not to participate. *See* J.A. 12

101

(noting only "most" of the audience stood). That a simple invitation to join—which the audience was free to reject—could be twisted into coerced participation in a religious act distorts the record. Instead, lower courts, including this one, must take the Supreme Court's counsel to heart and safely assume that mature adults can follow contextual cues without the risk of religious indoctrination. *See Marsh*, 463 U.S. at 792; *Town of Greece*, 134 S. Ct. at 1823 ("[A]dult citizens, firm in their own beliefs, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith.").

In *Town of Greece*, the prayer givers often asked the audience "to rise for the prayer" by extending invitations such as "Would you bow your heads with me as we invite the Lord's presence here tonight?"; "Let us join our hearts and minds together in prayer"; and "Would you join me in a moment of prayer?" 134 S. Ct. at 1826 (plurality opinion). Here, the designated commissioner would similarly offer a ceremonial invocation that typically started with "let us pray" or "please pray with me." Such transitional and prefatory courtesy hardly constitutes coercion under the Supreme Court's guidance. No case, before or after *Town of Greece*, stands for that principle. To the contrary, for coercion to be found the government must "orchestrate[] the performance of a formal religious exercise in a fashion that practically obliges the involvement of non-participants." *Myers*, 418 F.3d at 406. And in the context of legislative prayer, coercion must be measured "against the backdrop of historical practice" in which reasonable observers are deemed to be familiar with the tradition and purpose of a ceremonial prayer to open a legislative session. *Town of Greece*, 134 S. Ct. at 1825 (plurality opinion). Viewed through that lens, no reasonable person would interpret a commissioner's

102

commonplace and "almost reflexive" opening line of "let us pray" to compel their submission to the prayer. *Cf. id.* at 1832 (Alito, J., concurring). Such standard openings have been routinely offered for over two centuries in the U.S. Congress, the state legislatures, and countless local bodies. In short, such innocuous language cannot be what the Supreme Court contemplated when it expressed concern about prayer givers "direct[ing] the public to participate in the prayers." *Id.* at 1826 (plurality opinion).

Plaintiffs, the district court, and the majority assert that the Board's prayer practice made audience members feel subjectively "excluded at meetings" and that the Board's "disagreement with [their] public opposition to sectarian prayer could make [them] less effective advocate[s]." *See Lund*, 103 F. Supp. 3d at 715–16. This is a failed argument. *Town of Greece* explicitly rejected the same claim that perceived "subtle pressure to participate in prayers that violate their beliefs in order to please the board members from whom they are about to seek a favorable ruling" constitutes coercion. 134 S. Ct. at 1825 (plurality opinion). Merely exposing constituents to prayer they may find offensive is not enough. "[I]n the general course[,] legislative bodies do not engage in impermissible coercion merely by exposing constituents to prayer they would rather not hear and in which they need not participate." *Id.* at 1827.

Nor did the Board's prayer practice "chastise[] dissenters []or attempt[] lengthy disquisition on religious dogma." *Id.* at 1826. Rather, as illustrated above, the prayer content largely followed the spirit of solemn, respectful prayer approved in *Marsh* and *Town of Greece*. Moreover, the record shows that both attendance and participation in the invocations were voluntary. The Board has represented without contradiction that

103

members of the public were free "to remain seated or to otherwise disregard the Invocation in a manner that [was] not disruptive." J.A. 277. Thus, as a practical matter, citizens attending a Board meeting who found the prayers objectionable were not without recourse; they could arrive after the invocation, leave for the duration of the prayer, or remain for the prayer without participating, just like the audiences in *Marsh* and *Town of Greece*. To the extent individuals like Plaintiffs elected to stay, "their quiet acquiescence [would] not, in light of our traditions, be interpreted as an agreement with the words or ideas expressed." *Town of Greece*, 134 S. Ct. at 1827 (plurality opinion).

By suggesting that audience members should not be required to arrive "after the prayer, leave the room before the prayer, or simply stay seated" because doing so "served only to marginalize," Majority Op. 38, the majority rejects the precise actions the Supreme Court approved in *Town of Greece*. 134 S. Ct. at 1827 (plurality opinion) ("Nothing in the record suggests that members of the public are dissuaded from leaving the meeting room during the prayer, arriving late, or even, as happened here, making a later protest. In this case, as in *Marsh*, board members and constituents are free to enter and leave with little comment and for any number of reasons. Should nonbelievers choose to exit the room during a prayer they find distasteful, their absence will not stand out as disrespectful or even noteworthy. And should they remain, their quiet acquiescence will not, in light of our traditions, be interpreted as an agreement with the words or ideas expressed. Neither choice represents an unconstitutional imposition as to mature adults[.]").

104

The record is similarly devoid of evidence that anyone who chose not to participate during the prayer suffered adverse consequences, that their absence was perceived as disrespectful or was recognized by the Board in any way. To the contrary, the Board has attested, again without contradiction, that such conduct would have "no impact on [the constituent's] right to fully participate in the public meeting, including addressing the commission and participating in the agenda items in the same manner as permitted any citizen of Rowan County." J.A. 277. Plaintiffs point us to no evidence to the contrary. Thus, it is implausible on this record to suggest that Plaintiffs were "in a fair and real sense" coerced to participate in the exercise of legislative prayer. *Lee*, 505 U.S. at 586. In short, there's no evidence that "town leaders allocated benefits and burdens based on participation in the prayer, or that citizens were received differently depending on whether they joined the invocation or quietly declined." *Town of Greece*, 134 S. Ct. at 1826 (plurality opinion).

As it must do given the record, the majority concedes that it is not "suggest[ing] that the commissioners made decisions based on whether an attendee participated in the prayers." Majority Op. 37. Nonetheless, the majority divines constitutional jeopardy in the juxtaposition of ceremonial prayer immediately prior to Board business. *See* Majority Op. 37. That distinction lacks meaning given that legislative prayer is a ceremonial prayer practice that occurs at the start of a legislative meeting where a legislative body presumably intends to engage in legislative work. More to the point, Rowan County's meeting process is precisely that approved by the Supreme Court in *Town of Greece*. 134 S. Ct. at 1823 ("The relevant constraint derives from [the prayer's] place at the opening

105

of legislative sessions, where it is meant to lend gravity to the occasion and reflect values long part of the Nation's heritage.").

Significantly, at no time did the Supreme Court in *Town of Greece* suggest that legislative prayers at a local government meeting inherently presented any constitutional issue. Yet the innate qualities of local government meetings are where the majority directs its concerns. *E.g.*, Majority Op. 36 ("[T]he intimate setting of a municipal board meeting presents a heightened potential for coercion."); Majority Op. 36 ("[T]he commissioners consider[] citizen petitions shortly after the invocation," and "the Board exercises both legislative authority over questions of general public importance as well as a quasi-adjudicatory power over such granular issues as zoning petitions, permit applications, and contract awards."); Majority Op. 38 ("[T]he intimacy of a town board meeting may push attendees to participate in the prayer practice in order to avoid the community's disapproval."). If any of these inherent characteristics conflicted with the First Amendment, it would have been addressed in the Supreme Court's decision in *Town of Greece* because those circumstances were squarely part of that case and those arguments were made to the Court. But the Supreme Court rejected those claims, and the majority plainly errs by rejecting the course laid out by the Supreme Court.

Drawing on distinctions noted in Justice Alito's concurring and Justice Kagan's dissenting opinions in *Town of Greece*, the majority also cobbles together a distinction between prayers offered before the totality of a local governmental meeting and those said before a legislative portion of the meeting as distinct from an adjudicatory phase of the meeting. Majority Op. 36–37. But the majority in *Town of Greece* relied on no such

106

demarcation. The only relevant point in terms of order was that legislative prayer has historically been offered—as it was in *Marsh* and *Town of Greece*—at the "opening of legislative sessions, where it is meant to lend gravity to the occasion and reflect values long part of the Nation's heritage" and "invite[] lawmakers to reflect upon shared ideals and common ends before they embark on the fractious business of governing." *Town of Greece*, 134 S. Ct. at 1823. The legislative prayers here similarly occur at the opening of the Board's meeting as part of the ceremonial part of the meeting that also includes the Pledge of Allegiance. It occurs before *any* Board business, whether adjudicative or legislative. The majority's quibble finds no support in *Town of Greece*'s holding.

Because the Supreme Court has already rejected the concerns about the intimacy of legislative prayer before a local government meeting, that factor has no bearing on the constitutionality of Rowan County's practice. But the equally troubling result is that the rest of the majority's analysis applies with the same force to local, state, and federal legislatures. It will no doubt come as a surprise to members of the United States House of Representatives and Senate to learn that neither *Marsh* nor *Town of Greece* protect their right to offer legislative prayer.

IV.

Make no mistake, while the majority purports to have no problem with the idea of lawmaker-led legislative prayer in the abstract, its reasoning actually leaves no room for lawmakers to engage in the full panoply of legislative prayer practices to which *Town of Greece* grants constitutional protection. The lawmaker's mere status as a prayer giver is

107

viewed with immediate skepticism, and any sectarian content to his or her prayers is deemed to have an added coercive effect. Moreover, the majority refrains from providing any guidelines as to when, if ever, lawmaker-led legislative prayers can meet their newly minted constitutional standards. Majority Op. 38–39. Indeed, the only safe practice for lawmakers who want to offer a legislative prayer is to ignore what *Marsh* and *Town of Greece* permit and offer only a generic prayer to a generic god.

The Rowan County legislative prayer practice falls within the historical traditions recognized in *Marsh* and *Town of Greece* and the principles the Supreme Court articulated in both cases. It is constitutional.

For all these reasons, I would reverse the district court's judgment and enter final judgment for Rowan County. I respectfully dissent.